THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. M.D., Defendant-Appellant.

Second District   No. 2—90—0878

Opinion filed June 30, 1992.

G. Joseph Weller, Beth Katz, and Ingrid L. Moller, all of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, M.D., was convicted of committing aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14) by placing his fist into the vagina of his wife, L.D. We refer to defendant and the victim by their initials in order to protect the victim's identity. Defendant was sentenced to a 12-year term of imprisonment. On appeal, defendant contends as follows: (1) that the statutory sex offense scheme is unconstitutional because a marital exemption exists for certain sex offenses but not for others; (2) that the trial court erred by refusing to allow evidence concerning certain alleged past sexual practices of defendant and L.D.; (3) that the prosecuting attorney impermissibly laid a foundation to impeach defendant during cross-examination but failed to do so; and (4) the prosecuting attorney asked various improper questions and made improper comments during the trial. We affirm.

Defendant and L.D. were married in August 1978 and had two children. At trial, L.D. testified as follows. Defendant arrived home at 5:30 p.m. on January 10, 1990. He had to leave shortly thereafter to call on a client. Defendant asked if L.D. would be awake later on so they could have sex. They argued for awhile, and defendant then left to meet the client.

Defendant returned home after midnight. L.D. was in bed at the time. Defendant went into the bedroom and asked if L.D. had something for him. After L.D. failed to respond defendant went downstairs. About 20 minutes later, defendant went back to the bedroom, removed his clothes, and lay down next to L.D. He accused L.D. of having an affair with a man who belonged to her church group. Defendant then jumped out of the bed and said that he was not going to wait any longer. He punched L.D. in the back four times, jumped back onto the bed, and began choking her.

L.D. tried to get away, but was unable to do so. Defendant took her pants off, held her down with his forearm, and started to pry her legs apart. He inserted his penis into L.D.'s vagina and asked her to talk dirty. After about 10 minutes, L.D. was able to push defendant away. She went into the bathroom and then went downstairs to the living room. Defendant followed her.

At about 3 a.m., L.D., who normally left for work at 5:30 a.m., phoned her employer and stated that she would not be in that morning. She then returned to the living room and sat down. Defendant sat next to her. He asked how often L.D. felt they should have sex. When she responded by saying once a week, he became enraged because he felt they should have sex four times a week. Defendant pulled L.D. off the chair by her legs, dragged her across the living room floor, and forced her to go upstairs. He told L.D. that she had better do it right this time.

After L.D. got into bed, defendant grabbed a bedpost, banged it against the end of the bed a few times, and threatened to kill her. He got into bed and told L.D. to perform oral sex on him. Defendant then pried her legs apart and inserted his penis into her vagina. After about 15 minutes, defendant withdrew his penis. He went downstairs while L.D. remained in bed. L.D. looked at a clock and noticed that it was about five o'clock in the morning.

Defendant returned to the bedroom shortly thereafter and sat on the end of the bed. He grabbed L.D.'s legs, and she felt something cold. Defendant then placed his weight on top of her and jammed his fist into her vagina. According to L.D., all of defendant's hand entered her vagina up to his wrist. L.D. screamed and tried to get away. Defendant removed his fist, continued to hold L.D. down, and then jammed the fist into her vagina again.

Defendant then pulled L.D. off the bed, took her into the bathroom, and forced her to go into the shower with him. Defendant began masturbating and told her to perform oral sex on him. He left the shower after L.D. told him to get away from her. L.D. then put a sanitary napkin inside her panties because she was bleeding heavily. After L.D. left the bathroom, defendant went inside it. L.D. took this opportunity to run downstairs to call the police. She reached the operator and asked to be connected to the police. Defendant went downstairs, however, and took the phone away. L.D. and defendant then returned upstairs.

The operator sent the police to L.D.'s home, where they arrived a few minutes later. When L.D. saw flashing lights outside, she turned on the interior lights of the house. Defendant flipped the lights off, placed his hands over L.D.'s mouth, and pushed her into the bedroom. L.D. then ran downstairs to open the door. She told the three officers that defendant had jammed his fist into her private area. L.D. took one officer upstairs and showed her the bloodstain on the mattress. L.D. noticed that the bed sheets had been removed. The sheets were downstairs in the washing machine.

The police arrested defendant. L.D. went to the emergency room of a Rockford hospital. A doctor performed surgery on her and placed sutures inside her vagina. L.D. was released from the hospital on the afternoon of January 11. Because of defendant's actions on January 11, L.D. will suffer from urinary incontinence for the rest of her life and will need to take medication daily to prevent her from urinating uncontrollably.

L.D. further testified that defendant sent her 13 letters after his arrest. Three of those letters were introduced into evidence. In one, postmarked January 26, 1990, defendant stated, "I have done a terrible wrong to you and I just feel so sick inside because of it." In another, postmarked January 31, 1990, he stated, "My heart is so full of pitint [sic] grief. I wish I could go back to that terrible night." In the third letter, which was postmarked February 22, 1990, defendant said, "The worst day of my life was Jan. 11, 1990." He also said, "I love you very much *** and wish I never hurt you." In each of the above letters defendant asked L.D. to attempt to get the charges dropped so he would not be faced with a long prison sentence.

The three Rockford police officers who went to the home of defendant and L.D. on the morning of January 11, 1990, basically agreed with L.D.'s version of what happened upon their arrival. Each testified that they saw a light in the house go on and then off after they arrived. L.D. opened the front door for them. She was hysterical at the time, and she told the officers that defendant had jammed his fist into her private area. Defendant first told the officers that there was no problem and then said that L.D. had caused the trouble.

Two of the officers went upstairs. They saw a bloodstain on the mattress and saw eggshell fragments on the mattress, the bedroom floor, and in the hallway. L.D. told one of them that defendant had jammed his fist and an egg into her vagina. The officers went downstairs and saw the bed sheets in the washing machine. Defendant was placed under arrest and taken to the police station.

Detective Anthony Piccirilli of the Rockford police department interviewed defendant in a holding room at the Rockford police station at about 8:45 a.m. on January 11, 1990. Detective William Doner was also present. Piccirilli and Doner testified that defendant signed a form which stated that he agreed to waive his *Miranda* rights and talk to the detectives. The form also explained to defendant what his rights were. Piccirilli then questioned defendant, who gave a verbal statement concerning what had happened. As defendant did this, Piccirilli typed a written statement.

According to Piccirilli and Doner, when the two-page written statement was completed, they asked him to read it out loud. Defendant did so. They also asked him if there were any corrections which should be made. The only corrections were a few minor typographical errors. Defendant initialled each of these corrections, wrote his initials at the end of each paragraph, and signed the bottom of both pages of the statement. He initialled the statement in 14 separate places.

The written statement contains the following version of the events of January 10 to 11, 1990. Defendant was home with L.D. at about 4:30 in the afternoon on January 10. He had a business appointment that evening. Defendant told L.D. that he would be home from the appointment at about 10:30 p.m., and asked if she would be up. L.D. knew this meant that defendant wished to have sex with her after he came home from the appointment. L.D. said she would be tired.

Defendant returned home from the meeting at about 11:30 p.m. He went upstairs and said in a rude manner, "you better now." L.D. did not respond. Defendant then went downstairs and had something to eat. He returned upstairs about 20 minutes later and asked L.D. about a church activity. He also asked if L.D. was "feeling frisky." L.D. became angry and stated that was all defendant could think about. Defendant started to remove L.D.'s shirt, but L.D. said she would take it off. L.D. and defendant then took off all their clothes.

At this point, L.D. told defendant to lie down if he wanted it rough. Defendant tried to touch her, and L.D. tried to avoid him. L.D. twice grabbed defendant's testicles and squeezed them. After the first time, defendant told her that it hurt. After the second time, he grabbed her by the neck, and she relented. Defendant and L.D. then engaged in sexual intercourse for about 20 minutes. Defendant then went into the bathroom.

When defendant returned to the bedroom, he was angry and screamed at L.D. about the way she had treated him. L.D. then punched him. Defendant grabbed L.D.'s hair and told her to stop because things were getting out of control. Defendant then went downstairs for a few minutes.

After defendant returned upstairs, he and L.D. engaged in sexual intercourse again. Defendant was upset, however, because L.D. seemed disinterested. After they stopped, defendant went downstairs where he stayed for 20 minutes. While he was downstairs, defendant decided to get an egg from the refrigerator, take it upstairs, and place it in L.D.'s vagina. He brought an egg into the bedroom and put

the egg along with his fist into L.D.'s vagina. L.D. started screaming. Defendant then made her get into the shower with him. L.D. was bleeding. Defendant said to her, "now, how's that feel?" L.D. ran downstairs and called the police, who arrived about 20 minutes later.

Defendant's trial testimony was generally consistent with the above written statement with the following exceptions. He and L.D. did not engage in sexual intercourse twice during the early morning hours of January 11; instead, they had sexual intercourse once, and he later performed oral sex on her. Defendant felt that L.D. was cold and "standoffish" while they had sex. After he performed oral sex on her, defendant decided to stimulate her by using an egg. He had seen this done in pornographic films.

Defendant got an egg from the refrigerator and brought it up to the bedroom. He tried to stimulate L.D. by placing fingers from one hand into her vagina. He was holding the egg in the same hand. While he was doing this, L.D. grabbed his testicles. As a result, his entire hand accidentally went into her vagina, and the egg broke outside her vagina. L.D. screamed. Defendant saw a lot of blood and was scared. Defendant suggested that they go to a hospital. He then took L.D. into the shower. L.D. told defendant not to touch her, and he did not. When L.D. left the shower, she went downstairs and called the police, who arrived shortly thereafter.

Defendant testified that he did not read the written statement bearing his signature and was never told by Detectives Piccirilli or Doner to read the statement out loud. Instead, the detectives merely instructed defendant to sign or initial the statement in certain places, and he did so. He acknowledged signing the statement and writing the initials "M.D." on it at each place where those initials were on the statement.

Defendant denied telling the detectives that he put his fist and the egg into L.D.'s vagina. Defendant also denied telling the detectives that he said "now how's that feel" to L.D. while she was in the shower after the alleged incident. He admitted, however, that L.D. did not consent to having the egg placed in her vagina.

Mary Buzzell, an emergency room nurse at SwedishAmerican Hospital, spoke to L.D. and examined her when she arrived at the hospital's emergency room on January 11, 1990. According to Buzzell, L.D. stated that her husband had forcibly assaulted her and he had tried to strangle her. L.D. also stated that she had suffered injuries to her vagina because her husband had inserted his fist and an egg into it. Buzzell saw bruises on L.D.'s neck, bruises on her upper arms, a bite mark on her abdomen, and injuries to her vaginal area. She at-

tempted to insert a catheter into L.D.'s vagina but was unable to do so because of the injuries to L.D.'s vaginal area. Buzzell testified that L.D.'s blood pressure was very low upon her arrival at the hospital and L.D. could have been in a life-threatening situation because of the amount of blood she had lost had she not been treated.

Dr. Robert Eichmann, who treated L.D. at the SwedishAmerican Hospital emergency room on January 11, 1990, testified that he attempted to examine her vagina but was not able to do so because of the tenderness and swelling in the area. Dr. Eichmann noticed a fair amount of bleeding. He decided to perform surgery in order to determine the extent of L.D.'s injuries. Dr. Eichmann found lacerations inside L.D.'s vagina and sutured them. He did not find any eggshell fragments inside her vagina, although he found one in her anus. In Dr. Eichmann's opinion, the injuries suffered by L.D. could have been caused by a number of things, including having a fist placed in her vagina, or a person's fingernails.

Defendant had been charged with one count of battery, two counts of criminal sexual assault, and three counts of aggravated criminal sexual assault. The jury acquitted him of both counts of criminal sexual assault. These counts involved the two alleged incidents of forcible intercourse. It also acquitted defendant of the aggravated criminal sexual assault count which alleged that defendant had placed his fist and an egg into his wife's vagina and the count which alleged that he had endangered L.D.'s life. The jury found defendant guilty of the aggravated sexual assault count which alleged that he had placed his fist in L.D.'s vagina, and it found him guilty of battery. The trial court sentenced defendant to a 12-year term of imprisonment. Defendant now appeals.

Under section 12—18(c) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 12—18(c)), a person may not be charged by his or her spouse with the offenses of criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—15), or aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—16). This exemption does not apply to aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14), the offense of which defendant was convicted, or criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13). Defendant argues that applying the marital exemption only to the former two offenses violates the equal protection and due process clauses of the United States and Illinois Constitutions (U.S. Const., amend XIV; Ill. Const. 1970, art. I, §2).

Illinois courts employ the same analysis in considering equal protection claims under the Federal and State constitutions. (*People v.*

*Reed* (1992), 148 Ill. 2d 1.) The guarantee of equal protection does not deny the State the power when it enacts legislation to draw lines which result in different treatment for different classes of individuals. (*Reed*, 148 Ill. 2d at 7.) It does, however, prohibit the State from providing unequal treatment to individuals who are placed into different statutory classifications for reasons entirely unrelated to the purpose of the legislation. (*Eisenstadt v. Baird* (1972), 405 U.S. 438, 447, 31 L. Ed. 2d 349, 358-59, 92 S. Ct. 1029, 1035; *Reed*, 148 Ill. 2d at 7.) Statutory classifications must therefore be reasonable rather than arbitrary, and must result from some basis of difference having a fair and substantial relation to the objective of the legislation. *Eisenstadt*, 405 U.S. at 447, 31 L. Ed. 2d at 358-59, 92 S. Ct. at 1035.

Two standards are applied to review equal protection arguments. Strict scrutiny is applied if the statute contains a suspect classification such as one based on race or if it infringes upon a fundamental right. (*Reed*, 148 Ill. 2d at 7.) A law will not be upheld under this standard unless it is necessary to promote a compelling State interest and is narrowly tailored to serve that interest. *Reed*, 148 Ill. 2d at 7.

Defendant concedes that the strict scrutiny standard does not apply here, and the applicable standard is the rational basis test. When this standard is employed a statutory classification will be upheld if it bears a rational relationship to a legitimate statutory objective. (*Reed*, 148 Ill. 2d at 7-8.) If, as in the case at bar, a party contends that a statute violates his or her substantive due process rights and no fundamental right is implicated, that party must show that the statute is not rationally related to a legitimate governmental interest. (*People v. Lindner* (1989), 127 Ill. 2d 174, 188.) Thus, the standards for statutory validity under the due process and equal protection clauses are identical in the absence of a suspect classification or the infringement of a fundamental right. *Reed*, 148 Ill. 2d at 9-10; *People v. Adams* (1991), 144 Ill. 2d 381, 391.

■ Although the State does not contest defendant's standing to raise the above constitutional claim, we will briefly address this issue. Even if a party does not contend that it would be unconstitutional under any circumstances to apply the challenged statutory burden to him or her, that party has standing to raise a claim that the burden violates the equal protection clause when applied to him or her but not others. (*People v. Liberta* (1984), 64 N.Y.2d 152, 161-62, 474 N.E.2d 567, 571, 485 N.Y.S.2d 207, 211; see also *Williams v. State* (Ala. Crim. App. 1986), 494 So. 2d 819, 826.) Defendant contends here that it is irrational to prosecute him for committing an act of forcible sexual conduct involving penetration against his spouse when

individuals who commit acts of forcible sexual conduct which do not involve penetration against their spouses cannot be prosecuted under the current statutory sex offense scheme. He has standing to raise this claim that the current sex offense scheme violates the equal protection clause because it burdens him but does not burden others who are similarly situated.

Section 12—13(a)(1) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(1)) states that a person commits the offense of criminal sexual assault if he or she commits an act of sexual penetration by the use or threat of force. Sexual penetration is defined as any contact between the sex organ of one person and the sex organ, mouth or anus of another person, or the intrusion of any part of a person or animal's body or any object into the sex organ or anus of another person. Ill. Rev. Stat. 1991, ch. 38, par. 12—12(f).

Defendant was convicted of violating section 12—14(a) of the Code, which states that a person commits the offense of aggravated criminal sexual assault if he or she commits the offense of criminal sexual assault and one or more of the specified aggravating circumstances are present. (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a).) With respect to the charge of which defendant was convicted, the indictment alleged that he placed his fist in L.D.'s vagina by use of force. The alleged aggravating circumstance was that this caused bodily harm to L.D. See Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(2).

Section 12—15(a)(1) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 12—15(a)(1)) states that a person commits the offense of criminal sexual abuse if he or she commits an act of sexual conduct by the use or threat of force. Sexual conduct is defined as the intentional or knowing touching or fondling by either the accused or the victim of the other's sex organ, anus, breast, or any part of the body of a child under the age of 13 for the purpose of sexual gratification. (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(e).) A person is guilty of the offense of aggravated criminal sexual abuse if he or she violates section 12—15(a) of the Code and one or more specified aggravating circumstances is present. (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(a).) One of these aggravating circumstances is causing great bodily harm to the victim. See Ill. Rev. Stat. 1991, ch. 38, par. 12—16(a).

Under the above statutes, if defendant had committed an act of sexual conduct against L.D. which did not involve sexual penetration, he would have committed the offense of aggravated criminal sexual abuse. Because the marital exemption set forth in section 12—18(c) of the Act (Ill. Rev. Stat. 1991, ch. 38, par. 12—18(c)) applies to this offense, however, defendant could not have been prosecuted. We note

further that each of the above four statutes prohibits acts of sexual conduct or penetration under certain circumstances even if force or threat of force is not involved. Because this case involves allegations of forcible conduct involving penetration, however, we need only consider the constitutionality of the marital exemption as applied to the provisions outlawing forcible sexual assaults.

The purpose of the statutory scheme we are considering is to protect the personal dignity of potential victims of sex offenses. (See *People v. Terrell* (1989), 132 Ill. 2d 178, 210.) Sexual assaults are generally violent, degrading acts which cause severe physical and emotional damage to the victims. (*Coker v. Georgia* (1977), 433 U.S. 584, 597-98, 53 L. Ed. 2d 982, 993, 97 S. Ct. 2861, 2868-69; *People v. Liberta* (1984), 64 N.Y.2d 152, 164, 474 N.E.2d 567, 573, 485 N.Y.S.2d 207, 213.) Perpetrators of sexual assaults exhibit an utter contempt for the personal integrity of their victims and the right of those individuals to decide with whom they will establish intimate relationships. (*Coker*, 433 U.S. at 597, 53 L. Ed. 2d at 992, 97 S. Ct. at 2868-69.) The four statutes in question are designed to protect individuals from the physical and emotional harm resulting from sexual assaults and to preserve their personal bodily integrity.

Equal protection challenges have been brought in several States to statutes banning forcible sexual assaults and containing marital exemptions similar to the one we are considering. The Colorado Supreme Court held that a marital exemption to the State's first degree sexual assault statute did not violate the equal protection or due process clauses. (*People v. Brown* (Colo. 1981), 632 P.2d 1025, 1027.) Other States have held, however, that marital exemptions in similar statutes violated the equal protection clause. (See, *e.g., Merton v. State* (Ala. Crim. App. 1986), 500 So. 2d 1301, 1302-05 (marital exemption to forcible rape statute unconstitutional); *Williams v. State* (Ala. Crim. App. 1986), 494 So. 2d 819, 830 (marital exemption to forcible sodomy statute unconstitutional); *People v. Liberta* (1984), 64 N.Y.2d 152, 167, 474 N.E.2d 567, 575, 485 N.Y.S.2d 207, 215 (marital exemption to rape and sodomy statutes unconstitutional).) The statutes in each of the above cases proscribed conduct that is prohibited in Illinois under the criminal sexual assault or aggravated criminal sexual assault statute.

We recognize that the above out-of-State cases are arguably distinguishable from the one at bar because, as we have seen, there is no marital exemption for aggravated criminal sexual assault or criminal sexual assault, offenses for which the legislature provided greater punishment than criminal sexual abuse or aggravated criminal sexual

abuse. Our supreme court has held that the legislature could have rationally concluded that aggravated criminal sexual assault is a more serious crime and a greater affront to the personal dignity of the individual than the offense of aggravated criminal sexual abuse because it involves sexual penetration; therefore, providing more severe punishment for the former offense does not violate due process. (*People v. Terrell* (1989), 132 Ill. 2d 178, 210.) Thus, it could be argued that the situation is not the same as the ones present in *Brown, Merton, Williams,* and *Liberta* because Illinois does not recognize a marital exemption for its most serious sex offenses.

Nevertheless, we believe the above cases are of significant value because they discuss the source of marital exemptions in sexual offense statutes and analyze possible justifications for the continued existence of such exemptions. Although the State has offered no rationales to justify the existence of the marital exemption at issue here, we will examine the justifications which were discussed in the above cases. A marital exemption for the offense of rape existed at common law. (*Williams,* 494 So. 2d at 827.) The idea of recognizing this exemption originated with Lord Hale, the 17th century jurist, who, without citing any authority, wrote as follows:

> "[T]he husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract." (1 Hale, History of the Pleas of the Crown, at 629 (1800), quoted in *Liberta,* 64 N.Y.2d at 162, 474 N.E.2d at 572, 485 N.Y.S.2d at 212.)

Other traditional justifications for the marital exemption were the common-law doctrines that a woman was her husband's property and that her legal existence was consolidated into her husband's existence. 64 N.Y.2d at 164, 474 N.E.2d at 573, 485 N.Y.S.2d at 213.

The above archaic doctrines simply have no place in modern society, where the notions that a woman should be regarded as her husband's chattel and deprived of her dignity and recognition as a whole human being through the denial of a separate legal identity have been thoroughly rejected. (64 N.Y.2d at 164, 474 N.E.2d at 573, 485 N.Y.S.2d at 213; see also *Trammel v. United States* (1980), 445 U.S. 40, 52, 63 L. Ed. 2d 186, 196, 100 S. Ct. 906, 913.) Lord Hale's implied consent theory appears to be based largely upon the other two doctrines and is equally objectionable as it leads to the same result, depriving women of their dignity by refusing to recognize them as whole human beings who are entitled to decide whether or when they will engage in sexual relations.

■ The above doctrines were employed to justify the subjugation of women in English and American law and society during the past. Modern American law and society, however, have rejected these doctrines and have begun taking steps to recognize the rights of women, including their right to equal protection under the law. (See, *e.g.*, *Frontiero v. Richardson* (1973), 411 U.S. 677, 687-88, 36 L. Ed. 2d 583, 592, 93 S. Ct. 1764, 1770-71; *Reed v. Reed* (1971), 404 U.S. 71, 76-77, 30 L. Ed. 2d 225, 230, 92 S. Ct. 251, 254.) Furthermore, as other courts have pointed out with respect to Lord Hale's theory, it is irrational to imply consent to a sexual assault, which is generally a violent, degrading act that results in severe physical and psychological harm. (*Williams*, 494 So. 2d at 828; *Liberta*, 64 N.Y.2d at 164, 474 N.E.2d at 573, 485 N.Y.S.2d at 213.) A marriage license should not be viewed as a license to forcibly sexually assault one's spouse with impunity. (64 N.Y.2d at 164, 474 N.E.2d at 573, 485 N.Y.S.2d at 213.) A married individual has the same right to control his or her body as does an unmarried person. (*Williams*, 494 So. 2d at 828; *Liberta*, 64 N.Y.2d at 164, 474 N.E.2d at 573, 485 N.Y.S.2d at 213.) For these reasons, we conclude that the above traditional justifications do not provide a rational basis for marital exemptions in sexual assault statutes.

■ As the court pointed out in *Liberta*, other justifications have been raised in recent times for marital exemptions in sexual assault statutes, including the arguments that such exemptions protect against governmental intrusion into marital privacy and promote reconciliation between spouses. (64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.) The right to marital privacy was first recognized by the United States Supreme Court in *Griswold v. Connecticut* (1965), 381 U.S. 479, 485, 14 L. Ed. 2d 510, 515-16, 85 S. Ct. 1678, 1682, in which the Court held that a Connecticut statute banning the use of contraceptives was unconstitutional because of its effect upon the rights of married persons. There is no suggestion in *Griswold* that the right to marital privacy was meant to apply outside the context of consensual marital relations, and other courts have concluded that it does not. See *Cotner v. Henry* (7th Cir. 1968), 394 F.2d 873, 875; *Williams*, 494 So. 2d at 828-29; *Liberta*, 64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.

We are in complete accord with these holdings. In *Griswold*, the Court stated that the Connecticut statute at issue sought to achieve its goals "by means having a maximum destructive impact" upon the marital relationship. (*Griswold*, 381 U.S. at 485, 14 L. Ed. 2d at 515, 85 S. Ct. at 1682.) In our view, a sexual assault perpetrated by one spouse upon the other also has a maximum destructive impact upon

the marital relationship. This would make it particularly inappropriate to interpret *Griswold,* a holding designed to protect the marital relationship, in such a manner as to prevent prosecution of persons who commit forcible sexual assaults against their spouses. As the court stated in *Liberta,* while protection of marital privacy is a legitimate State interest, there is no rational relationship between this interest and allowing an individual to commit a forcible sexual assault upon his or her spouse. (64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.) We therefore reject the marital privacy rationale as did the courts in *Williams* and *Liberta.*

The Colorado Supreme Court held in *People v. Brown* (Colo. 1981), 632 P.2d 1025, 1027, that the interest in promoting marital reconciliation and preserving family relationships provided a rational basis for the marital exception in that State's first-degree sexual assault statute. The courts in *Williams* and *Liberta* concluded that this rationale was untenable, however (*Williams,* 494 So. 2d at 829; *Liberta,* 64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214), and we agree. It is the violent act of committing a forcible sexual assault which disrupts a marriage and not the injured spouse's attempt to seek redress in the criminal justice system. (*Williams,* 494 So. 2d at 829; *Liberta,* 64 N.Y.2d at 167, 474 N.E.2d at 575, 485 N.Y.S.2d at 215.) Additionally, if a marriage has deteriorated to the point where one spouse commits a forcible sexual assault upon the other and the victim desires to see the perpetrator imprisoned, reconciliation is hardly a likely prospect. *Williams,* 494 So. 2d at 829; *Liberta,* 64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.

■ Equally untenable is the contention that forcible sexual assault is not as serious an offense if the victim and perpetrator are married and can therefore be addressed adequately by other statutes, such as the battery and aggravated battery statutes (Ill. Rev. Stat. 1991, ch. 38, par. 12–3; Ill. Rev. Stat. 1991, ch. 38, par. 12–4). It would seem that a forcible sexual assault committed by a person's spouse would be even more traumatic than one committed by another individual as the perpetrator would be someone with whom the victim had once shared a loving, intimate relationship. (*Williams,* 494 So. 2d at 830; see also *Liberta,* 64 N.Y.2d at 167, 474 N.E.2d at 575, 485 N.Y.S.2d at 215.) As we have previously stated, a married person should have the same right to control his or her body as does an unmarried person. Moreover, the existence of the statutes outlawing criminal sexual abuse, criminal sexual assault, and the aggravated forms of these crimes results from a recognition that the nature of the harm resulting from a forcible sexual assault is different from

that resulting from an ordinary assault. (*Williams*, 494 So. 2d at 829.) For these reasons we do not accept the theory that a sexual assault committed by a person against his or her spouse is a less serious offense than any other sexual assault or that other criminal statutes adequately address the problem of marital sexual assaults.

▮ The final rationales that have been asserted in support of the marital exemption are that a marital sexual assault would be difficult to prove and that a possibility of fabricated complaints from vindictive spouses exists. (*Liberta*, 64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.) The former argument is based upon the problem of proving lack of consent. (64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.) What this argument fails to take into account is that the problem of proving lack of consent is likely to be present in most cases in which the alleged victim and perpetrator have had a prior consensual sexual relationship regardless of whether they were married or unmarried. (*Williams*, 494 So. 2d at 829; *Liberta*, 64 N.Y.2d at 165, 474 N.E.2d at 574, 485 N.Y.S.2d at 214.) With regard to the other contention, we find no basis for believing that a vindictive spouse is more likely to fabricate a sexual assault charge than a vindictive unmarried former lover. (64 N.Y.2d at 166, 474 N.E.2d at 575, 485 N.Y.S.2d at 215.) Accordingly, we conclude that these two rationales do not provide any rational basis for the marital exemption for acts of forcible sexual conduct.

As we have previously noted, the Illinois marital exemption does not apply to all sexual offenses and is arguably inapplicable to the most serious sexual offenses. The State's primary contention in support of the marital exemption is that the legislature is not required to solve all of the evils associated with a particular problem in one fell swoop; instead, it may tailor a statute to the particular problem that it seeks to solve. (*People v. Adams* (1991), 144 Ill. 2d 381, 391; *Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 371.) In the above two cases, however, our supreme court cited reasons why the legislature may rationally have chosen to address only the evils that it focused upon in the statutes at issue. (See *Adams*, 144 Ill. 2d at 392; *Chicago National League Ball Club, Inc.*, 108 Ill. 2d at 371-72.) Here, there is no rational basis for a statutory scheme which protects an individual from acts of forcible sexual penetration committed by a spouse but does not protect the individual from other acts of forcible sexual exploitation by his or her spouse. The marital exemption is completely contrary to the statutory objectives of protecting people from the physical and emotional harm re-

sulting from forcible sexual assaults and preserving their personal bodily integrity.

■ We therefore conclude that the marital exemption set forth in section 12—18(c) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 12—18(c)) violates the equal protection and due process clauses of the United States and Illinois Constitutions when it is applied to section 12—15(a)(1) of the Code or to a violation of section 12—16 which is predicated upon a violation of section 12—15(a)(1). As Justice Oliver Wendell Holmes once wrote:

> "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." (Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897), quoted in *Liberta*, 64 N.Y.2d at 167, 474 N.E.2d at 575, 485 N.Y.S.2d at 215.)

We agree with the conclusion of the court in *Liberta* that the above statement is an apt characterization of the marital exemption in sexual assault statutes. 64 N.Y.2d at 167, 474 N.E.2d at 575, 485 N.Y.S.2d at 215.

Defendant argues that his conviction must be reversed because the statutory scheme under which he was convicted is unconstitutional. We disagree. The fact that a statute contains an unconstitutional provision does not render the entire enactment unconstitutional unless it is determined that the legislature would not have enacted the statute without the invalid portion. (*City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 490; see also *People ex rel. Chicago Bar Association v. State Board of Elections* (1990), 136 Ill. 2d 513, 534.) The question of whether the remaining portions of an enactment are severable from the unconstitutional portion is thus a question of legislative intent. *Springfield Rare Coin Galleries, Inc. v. Johnson* (1986), 115 Ill. 2d 221, 237.

■ As we have previously indicated, the criminal sexual abuse and aggravated criminal sexual abuse statutes serve the important interests of protecting the personal bodily integrity of individuals and protecting them from the emotional and physical harm that results from sexual assaults. In light of the importance of these interests, we have no doubt that the legislature would have enacted sections 12—13 through 12—16 of the Code without a marital exemption applicable to sections 12—15(a), and, under certain circumstances, to section 12—16(a). Accordingly, we conclude that the invalidity of the marital exemption provided in section 12—18(c) when applied to the above provi-

sions does not affect the validity of the criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse or aggravated criminal sexual abuse statutes. We note that other courts which have concluded that marital exemptions to sexual assault statutes are unconstitutional have also determined that the remainder of the provision is valid because the exemption is severable. See, *e.g., Merton*, 500 So. 2d 1301; *Williams*, 494 So. 2d at 831; *Liberta*, 64 N.Y.2d at 172, 474 N.E.2d at 578-79, 485 N.Y.S.2d at 218-19.

Although our decision has the effect of expanding the scope of a criminal statute, this does not deprive defendant of due process of law. Defendant did not come within the marital exemption which we have held to be invalid in part, and he therefore had fair warning at the time of his alleged conduct that it was prohibited under the aggravated criminal sexual assault statute. (64 N.Y.2d at 172, 474 N.E.2d at 579, 485 N.Y.S.2d at 219.) The partial invalidity of section 12—18(c) does not provide a basis for the reversal of defendant's conviction.

■ Defendant next contends that the trial court erred by ruling that certain evidence he wished to introduce regarding past consensual sexual practices with L.D. was inadmissible. More specifically, defendant wished to introduce evidence that he had engaged in consensual sexual acts with L.D. during which he placed cucumbers, whipped cream, and peaches into her vagina in order to stimulate her. The State contends that this evidence was inadmissible under the rape-shield statute (Ill. Rev. Stat. 1991, ch. 38, par. 115—7), and that it was not relevant.

Section 115—7(a) states as follows:

"In prosecutions for aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse or criminal sexual abuse, the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat. 1991, ch. 38, par. 115—7(a).)

Section 115—7(b) states in part as follows:

"No evidence admissible under this Section shall be introduced unless ruled admissible by the trial judge after an offer of proof has been made at a hearing to be held in camera in order to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied." (Ill. Rev. Stat. 1991, ch. 38, par. 115—7(b).)

The remainder of section 115—7(b) states that the offer of proof must contain reasonably specific information as to the date, time, or place of the alleged past sexual activity or the evidence will not be admitted. Ill. Rev. Stat. 1991, ch. 38, par. 115—7(b).

According to the State, L.D. admitted to prior sexual conduct with defendant by testifying that he was the father of her two children. The State contends that under section 115—7(b) the evidence defendant sought to introduce was inadmissible because the alleged victim admitted to prior sexual activity with him, thus negating any need for impeachment.

The Appellate Court, Third District, rejected the same argument, holding that it was based upon "a misreading of the statute." (*People v. Schuldt* (1991), 217 Ill. App. 3d 534, 541.) We agree. The test set forth in section 115—7(b) is whether the defense has evidence to impeach the alleged victim in the event he or she denies past sexual acts with the defendant and whether the evidence is reasonably specific as to the date, time, or place of these acts. Nowhere does section 115—7 state that such evidence is inadmissible if the alleged victim admits to prior sexual conduct with the defendant. We therefore reject the State's contention.

Likewise, we reject defendant's contention that evidence of past sexual conduct between defendant and the alleged victim which is not barred under section 115—7 is presumed relevant under the statute. The court in *Schuldt* held that such evidence "remain[s] subject to standards of relevancy" (*Schuldt*, 217 Ill. App. 3d at 541), and we agree with this conclusion. Section 115—7 refers to "evidence admissible under this Section" (Ill. Rev. Stat. 1991, ch. 38 par. 115—7(b)), but this language does not preclude the possibility that evidence admissible under the provision could be deemed inadmissible under the rules of evidence. There is no other language in section 115—7 suggesting any presumption of relevancy.

Defendant contends that the trial court's refusal to admit the proffered evidence denied him an opportunity to develop a defense of consent. The evidence was relevant, according to defendant, because it related to sexual conduct involving food, thus tending to show that L.D. may have consented to having the egg placed in her vagina.

◼ The problem with defendant's argument is that the explanation he gave at trial for his conduct was that it was an accident, not that L.D. consented. Defendant stated during his testimony that L.D. did not consent to his use of the egg. He also testified that his hand accidentally slipped into her vagina after she squeezed his testicles. Therefore, consent was not an issue at trial; instead, the determina-

tive issue was whether defendant's conduct was deliberate or accidental. The trial court did not err by ruling that the proffered evidence was inadmissible as it shed no light on the above issue.

■■■ Defendant next contends that he should receive a new trial because the prosecuting attorney insinuated while cross-examining him that defendant had been fired from three jobs and failed to present evidence impeaching defendant when he denied this. Defendant acknowledges that he failed to raise this issue at trial. Ordinarily, this would result in a waiver of the above issue for purposes of appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant contends, however, that this issue should be reviewed under the plain-error exception in criminal cases to the waiver rule (see 134 Ill. 2d R. 615(a)). The plain-error rule will be applied in criminal cases if the evidence was closely balanced or if the error was so serious that it deprived the defendant of a fair trial. *People v. Priola* (1990), 203 Ill. App. 3d 401, 421.

Here, the evidence was not closely balanced. L.D.'s testimony that defendant placed his fist into her vagina was supported by her prompt complaint to the police and hospital personnel, the extent of her injuries, the physical evidence at the scene, including the eggshell fragments and the bloodstained mattress, defendant's written confession, and the admission in defendant's letter to L.D. that he had wronged her. Additionally, defendant's original statement to the police officers who responded to L.D.'s phone call that nothing was wrong was evidence of his consciousness of guilt (see *In re P.A.G.* (1990), 193 Ill. App. 3d 601, 604 (false exculpatory statement was evidence of consciousness of guilt)), as was his apparent attempt to destroy evidence by washing the bed sheets right after L.D. was injured.

We note that in defendant's written confession, he admitted placing his fist into L.D.'s vagina and then following her into the shower and asking, "now how's that feel?" Defendant's testimony that the two-page confession did not reflect what he told the police in some important respects and that he never read the confession is incredible in light of the fact that he admitted signing the bottom of both pages and initialling the confession in 14 separate places. Furthermore, defendant's testimony that his entire hand accidentally slipped into L.D.'s vagina is extremely dubious. The State's evidence against defendant was overwhelming.

Additionally, the alleged error would not have deprived defendant of a fair trial. The prosecuting attorney's insinuations concerned a remote matter with little, if any relevance. We therefore decline to apply the plain-error rule.

Defendant also contends that he is entitled to a new trial because of certain allegedly improper questions asked during *voir dire*. The prosecuting attorney repeatedly advised prospective jurors that they would hear two versions of events and then asked if this would automatically create a reasonable doubt in the mind of the prospective juror. Defense objections to each of these questions were overruled by the trial court.

The prosecuting attorney also asked one prospective juror, "Could you find this defendant guilty based upon the victim's testimony alone if you believe that the defendant was guilty of the offense?" The trial court sustained a defense objection to this question. The prosecuting attorney then asked similar questions, with minor changes, to two other prospective jurors. Defense objections to both questions were sustained by the trial court.

Even if error occurs at trial, a defendant's conviction will be affirmed on appeal if a review of the entire record reveals that the error was harmless beyond a reasonable doubt. (*People v. Arman* (1989), 131 Ill. 2d 115, 127.) Error will be considered harmless beyond a reasonable doubt if evidence that was properly admitted was so overwhelming that no fair-minded trier of fact could have reasonably voted to acquit the defendant. *People v. Carlson* (1982), 92 Ill. 2d 440, 449.

██ We conclude that any error resulting from the prosecutor's questioning during *voir dire* was harmless beyond a reasonable doubt. Ordinarily, we would be reluctant to reach such a conclusion in a case involving conflicting testimony. However, as we have stated, the case against defendant was overwhelming. L.D.'s testimony was corroborated by a great deal of evidence, including defendant's written confession in which he admitted committing the offense. There was no evidence that the police used any improper coercive tactics to gain the confession. Defendant's testimony that the brief written confession is inaccurate and that he never read it is belied by his admission that he signed or initialled it 16 times. Accordingly, we conclude that no fair-minded jury could have voted to acquit defendant. Any error in this context was harmless.

Defendant's final contention is that certain comments made by the prosecuting attorney during closing argument were improper. At one point during his closing argument, the prosecutor stated as follows:

> "Who's going to say, well we have got to prove him guilty beyond a reasonable doubt, beyond all reasonable doubt, and that is not what we are here for. This isn't perfect evidence. We

didn't scrape off every piece of blood and examine it. This is a marital relationship. If this is consensual of a marital relationship, well, maybe then it should read to [*sic*] death do us part or until my husband jams his fist in my vagina. Maybe that should be in the marriage contract then."

Defendant asserts that the last two sentences of this remark were inflammatory and the initial sentence was an improper attempt to define the concept of reasonable doubt.

Defendant also contends that certain other remarks during the prosecutor's closing statement were improper. In these remarks, the prosecutor stated that if defendant's testimony was true, all of the police officers who testified were lying. The prosecutor also mentioned that Detectives Piccirilli and Doner had been on the police force for a total of 38 years and questioned whether they would sacrifice their careers for defendant's case. He further stated that, if the detectives were going to draw up a phony confession, they could have done a better job. According to defendant, these remarks were improper because the prosecutor expressed his personal belief in the credibility of the police officers and implied that they were more credible because they were police officers.

Defendant did not object to these remarks at trial or in his post-trial motion. This issue is therefore waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87.) We must now decide whether to apply the plain-error rule. As we have previously indicated, the evidence at trial was not closely balanced.

Nor do we believe the alleged errors were serious enough to deprive defendant of a fair trial. We do not interpret the prosecutor's remarks regarding the police officers' credibility as opposed to defendant's as stating that the detectives were more credible because they were police officers or that the prosecutor was personally vouching for their credibility. Instead, the prosecutor was stating that it was doubtful that the officers would have risked their careers by typing up a phony confession which was not based upon defendant's comments. The prosecutor was also stating that experienced officers such as the two detectives would have come up with a better phony confession had they made it up.

The prosecutor's remarks regarding reasonable doubt did suggest that this standard was not applicable. However, the trial court instructed the jury that the reasonable doubt standard applied. Even if the prosecutor's comment that the marriage contract should henceforth read till "death do us part or until my husband jams his fist into my vagina" was improper, we do not believe this would have deprived

defendant of a fair trial. We decline to apply the plain-error rule to the prosecutor's alleged improper comments during closing argument.

For the above reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

GEIGER and BOWMAN, JJ., concur.