THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN D. PRINTY, Defendant-Appellant.

Second District   No. 2—90—0692

Opinion filed August 12, 1992.—Rehearing denied September 14, 1992.

G. Joseph Weller, Manuel S. Serritos, and Anne S. Quincy, all of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, John Printy, was indicted in the circuit court of Du Page County on one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)) and one count of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)). The State dismissed the criminal sexual assault count, and, following a jury trial, defendant was found guilty in a jury trial of aggravated criminal sexual assault and was sentenced to a 12-year term of imprisonment.

Defendant raises the following issues on appeal: (1) whether the marital exemption created by section 12—18(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—18(c)) violates equal protection and due process; (2) whether defendant was denied due process by the trial court barring his access to the victim's mental health records; and (3) whether defendant was denied his sixth amendment right of confrontation when the trial court barred defendant from cross-examining the victim concerning her mental health.

Prior to trial, defendant filed a motion for additional discovery in which he requested production of "[a]ny and all reports regarding the treatment of [the victim] for manic-depression, including releases for

any doctors involved to speak with Defendant's representatives." At a hearing on September 20, 1989, the prosecutor stated that, as to the medical reports pertaining to the victim, the State had already obtained one report and was awaiting two additional reports from other hospitalizations. The State suggested that the matter be continued for an *in camera* inspection of the reports, and defense counsel agreed that all the reports would be subject to *in camera* inspection to determine their admissibility and relevance.

On November 6, 1989, the prosecutor stated to the court that the State possessed the reports from Parkside Lutheran Hospital and Warrenville Clinic related to the victim's hospitalizations. Defendant's newly appointed counsel asked for leave to file a second motion for additional discovery, a copy of which he had previously tendered to the State. There is no such motion contained in the record in this case. On that same date, the court entered an order that it would review, *in camera*, the reports from Parkside Lutheran Hospital and Warrenville Clinic.

At the hearing on November 14, 1989, the trial court stated that it had reviewed an intake report from Central Du Page Hospital and psychiatric reports from Warrenville Clinic and Parkside Lutheran Hospital. The court ruled that defendant was entitled to the intake report from Central Du Page Hospital. The State then argued that the remaining reports should not be disclosed because they contained no "Brady" material, did not indicate any denials, retractions or recantations by the victim or any evidence of hallucinations or tremors, and did not contain any relevant material. Defendant maintained that because the victim testified in a domestic relations case that she was hospitalized for a manic-depressive disorder from October 21, 1988, to November 2, 1988, and that because the offense occurred on October 7, 1988, there was a need to know how the victim's "mental condition relates to her credibility, perception and memory." (Defendant incorrectly noted the date of the offense was October 7, 1988; it was actually September 7, 1988.)

In denying defendant's motion as to the remaining reports, the court stated that it had reviewed the documents on two occasions and noted "absolutely no statements at all with respect to this incident by the victim." The court further commented that there was nothing in the reports that in any way reflected on the truth or veracity of the victim. Likewise, the court found "nothing at all with respect to any memory problems or perception problem" of the victim. The court pointed out that there were even references in the reports that the

victim's memory was intact and excellent. Finally, the court found nothing in the report that could be used to impeach the victim.

The State subsequently filed a motion *in limine* seeking to bar defendant from eliciting testimony or introducing evidence of the victim's prior psychiatric hospitalization and of the victim having been diagnosed with a psychiatric disorder. The trial court granted the motion as to both points.

The evidence at trial established that on September 7, 1988, defendant was married to but separated from the victim. The victim testified that at about 10:30 p.m. on that date defendant forced her into her apartment and ordered her to undress. The telephone rang, and the victim answered it. Realizing it was a male acquaintance calling, the victim said, "Hi, Mother. Everything is fine. I will see you tomorrow. Everything is fine."

After the telephone call, defendant pushed her into the bedroom, and she removed all her clothes except her pantyhose. Defendant pulled them down and got on top of her. After asking the victim if she called the police, defendant stated that he would kill her if she did and pulled out a knife, putting it to her throat. The victim identified a knife found between the mattresses of her bed by the police as the one used by defendant to threaten her.

Defendant held the knife to her throat as he penetrated her with his penis. Defendant rolled over and told the victim to perform oral sex on him. She did so, and then defendant placed his mouth on her genitals.

Eventually there was a knock at the door; defendant ran out and returned saying, "It is the cops." He told the victim to get dressed and tell the police nothing was wrong. As the victim approached the door, she saw two police officers and ran out the door and behind them. She told the police to arrest defendant and repeatedly told them she had an order of protection. After the police arrested defendant and left, she telephoned a male acquaintance and told him she had been raped and needed to go to the police station. Prior to her leaving for the police station, the victim observed that the screen around the lock on the sliding door had been cut.

One of the officers who arrested defendant at the victim's apartment testified that he saw the victim again on the following morning at about 12:14 a.m. at the police department. At that time, the victim related that she had been raped by defendant at knifepoint. On cross-examination, the officer added that the victim asked him whether he could arrest defendant if defendant had put a knife to her throat and threatened to kill her. According to the officer, the victim never men-

tioned the word rape to him or the other officer while they were at her apartment.

Detective Kenneth Watts of the Wheaton police department testified that he went with the victim to her apartment the following morning. He observed a cut in the screen next to the lock on the patio door. Upon lifting the top mattress of the bed where the alleged assault occurred, he found a closed folding knife lying on the exposed box springs. He identified the same knife that the victim previously identified as defendant's as the knife he found between the mattresses. He also identified a pair of pantyhose as those he found on the floor near the bed and described them as being inside out with a tear about halfway around the top.

According to Detective Watts, he met with defendant later that day. After being advised of his *Miranda* rights, defendant told Watts that he climbed onto the victim's balcony, cut the screen with his knife and entered her apartment. After some period of waiting for her to come home, defendant went outside. When she returned, he took out his knife and forced her into the apartment and made her perform oral sex on him. He also admitted to having had vaginal intercourse with the victim. He asked Watts if the police had found the knife and stated that he hid it under the mattress after he observed the police at the victim's door.

Defendant testified in his own behalf. He stated that the knife found in the victim's apartment looked like one he owned except the tip of his knife was not broken. While he admitted to using a knife to open the screen door on a prior occasion, he denied having made the cut discovered by Detective Watts. He could not locate his knife the day following his using it to open the screen door although he did not intentionally leave it at the victim's apartment.

According to defendant, he spoke on the telephone to the victim on September 7, 1988, just before she got off of work. He asked her if she found his knife, and she responded yes. He asked if he could come over later that evening and pick up his knife, and the victim said that would be fine.

He arrived at her apartment around 9:15 p.m. and sat outside waiting for the victim to arrive. He eventually decided to enter the apartment via the patio screen door and look for his knife. Upon discovering the screen door was unlocked, he entered the apartment. He then exited the apartment through the hallway door and went to the parking lot.

When the victim arrived, he had a conversation with her outside the apartment resulting in her spitting in his face, and his slapping

her with a glove. Defendant and the victim then entered the victim's apartment. They eventually engaged in sexual intercourse twice with the victim's consent. Defendant denied having a knife in his hand during that evening or forcing the victim into the bedroom. After the second sexual encounter, the victim asked defendant to withdraw an affidavit he had prepared in a custody case apparently involving the victim and a former husband. Defendant denied making the incriminating statements testified to earlier by Detective Watts.

A short time after the incident, defendant went to Texas to live with his father. While there, the victim telephoned him. When defendant asked her why she did not drop the charges against him, the victim responded that she could not because of the custody case. According to defendant, in another telephone conversation with the victim in November 1988, she told him that the reason she made the rape complaint against him was because of his submitting the affidavit in the custody case. Again, in a conversation with the victim in jail after defendant's arrest, the victim told defendant, in reference to the custody case, that if nothing happened to her daughter, nothing would happen to defendant. Defendant did in fact testify in the custody case.

The jury found defendant guilty, and he was sentenced to 12 years in prison. He then filed this timely appeal.

Defendant's first appellate contention is that the challenged statutory scheme, in effect at the time of his conviction, violated equal protection and substantive due process because it provided for prosecution of a defendant for aggravated criminal sexual assault against a spouse while exempting persons from prosecution for three other sex crimes when perpetrated against spouses. (Ill. Rev. Stat. 1987, ch. 38, par. 12—18(c).) It is irrational, the argument continues, to exempt spouses from prosecution for other sex offenses which, according to the circumstances of individual cases, might be equally or more serious in nature than the circumstances supporting a prosecution for aggravated criminal sexual assault.

This court, in a recent decision, addressed this same issue in the context of a defendant's being charged under a more recent statutory scheme which eliminated the marital exemption for criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—18(c)). (See *People v. M.D.* (1992), 231 Ill. App. 3d 176.) The defendant there contended that applying the marital exemption to only the criminal sexual abuse and aggravated criminal sexual abuse statutes violated equal protection and due process under both the State and Federal constitutions. (*M.D.*, 231 Ill. App. 3d at 185-86.) This court held that the marital exemption violated equal protection and due process but went on to af-

firm that defendant's aggravated criminal sexual assault conviction. *M.D.*, 231 Ill. App. 3d at 193.

■ In the present case, defendant's conviction also must stand as he was convicted under a statute to which the marital exemption did not apply; therefore, defendant is in no position to benefit from any determination that the marital exemption is constitutionally infirm. He was not denied due process in that regard as he was on notice at the time of his alleged conduct that such actions were prohibited under the aggravated criminal sexual assault statute.

■ Even assuming the validity of the marital exemption, defendant cannot prevail with the argument that the absence of an exemption applicable to the aggravated criminal sexual assault statute denied him equal protection and due process. The fourteenth amendment to the Federal Constitution requires equal treatment between groups of persons similarly situated. (*Jenkins v. Wu* (1984), 102 Ill. 2d 468, 477.) It does not prohibit a State from treating different classes of persons differently. (*Jenkins*, 102 Ill. 2d at 477.) In the present case, defendant attempts to characterize himself as part of a group that is "similarly situated" to other groups in that he is a spousal member of a group of individuals subject to the proscriptions of one of the four sex offenses listed above. The statutes at issue in this case do not differentiate, however, between similarly situated persons. But for the coincidental fact that defendant belongs to a group consisting of spousal offenders, he cannot be said to be similarly situated to those persons who have violated the statutory provisions other than aggravated criminal sexual assault. The statutes establish four separate and distinct offenses, and a person who commits one offense cannot be held to be similarly situated to persons who have committed others.

Aggravated criminal sexual assault, unlike the other three sex offenses, requires a defendant to have committed an act of sexual penetration accompanied by certain aggravating factors distinguishing it from criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14.) Thus, aggravated criminal sexual assault is distinct from criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—15) and aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16) as these latter two offenses do not have the element of sexual penetration. Likewise, aggravated criminal sexual assault is different from criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13) because the former has various aggravating factors, at least one of which must be present to constitute the offense.

It is evident that the legislature chose to create four distinctly different offenses, each of which has its own specific penalty. Although there may be some overlap between the offenses in that criminal sexual assault and aggravated criminal sexual assault both require sexual penetration, and aggravated criminal sexual abuse and aggravated criminal sexual assault have some of the same aggravating factors, they are nevertheless different offenses that proscribe distinctly different conduct. Accordingly, defendant, as a person convicted of violating the aggravated criminal sexual assault provision, cannot claim to be a member of a group similarly situated to those persons who violate any of the other sex offenses proscribing distinctly different conduct.

Moreover, defendant, as a spousal sex offender, is not subject to different treatment under the aggravated criminal sexual assault statute than a nonspousal sex offender. All persons who commit aggravated criminal sexual assault are subject to prosecution regardless of their marital status. Defendant is in no worse position under the statute because of his membership in a group consisting of spouses. We hold, therefore, that equal protection principles are not implicated in this case.

Defendant also contends that the aggravated criminal sexual assault's applicability to a spouse denied him due process. Specifically, he maintains that it was irrational for the legislature to allow for prosecution of spouses who commit aggravated criminal sexual assault.

We begin by emphasizing that legislative enactments carry a strong presumption of constitutionality, and the party challenging the statute has the burden of clearly establishing its invalidity. (*People v. Lindner* (1989), 127 Ill. 2d 174, 178.) Furthermore, it is the province of the legislature to define offenses and determine the penalties required to protect the interest of society. *People v. Terrell* (1989), 132 Ill. 2d 178, 216.

A legislative enactment is required to bear a reasonable relationship to the public interest intended to be protected, and the means adopted must be a reasonable method of accomplishing the intended objective. (*People v. Lindner*, 127 Ill. 2d at 180; *People v. Wick* (1985), 107 Ill. 2d 62, 65.) In applying this test, we must identify the public interest the statute is intended to protect, examine whether the statute bears a reasonable relationship to that interest and determine whether the method used to protect or further that interest is reasonable. *Lindner*, 127 Ill. 2d at 180.

While the effect of the Criminal Sexual Assault Act of 1984 was to recodify the existing sexual offenses into a comprehensive statute (see *People v. Haywood* (1987), 118 Ill. 2d 263, 271), the underlying purpose was to protect the victims and punish the perpetrators of sexually impermissible conduct. Thus, the public interest served by the statutes is to curtail sexually harmful and offensive conduct.

The aggravated criminal sexual assault statute bears a reasonable relationship to the State's interest in that it proscribes certain sexual conduct which is harmful and offensive to its victims. Additionally, the method used to protect or further the State's interest is reasonable. The aggravated criminal sexual assault statute is designed to protect victims of forcible sexual penetration where such conduct is accompanied by certain aggravating circumstances. It is apparent that the legislature viewed the protection of victims of acts of forcible sexual penetration accompanied by one of the aggravating circumstances to be of prime importance as it provided for the offense to be punished as a Class X felony. Ill. Rev. Stat. 1987, ch. 38, par. 12—14(c).

Because the legislature apparently considered the protection from the conduct proscribed in the aggravated criminal sexual assault statute as being more important than the protection afforded by the other three sex offense provisions, it is reasonable for the legislature to have allowed for the prosecution of spouses thereunder, notwithstanding its attempt to exempt spouses from prosecution under what it apparently considered to be less serious sex crimes. Consequently, the legislature's decision to provide for the prosecution of spouses who engaged in conduct violative of the most serious of the sex offenses was a reasonable method of furthering its goal of protecting victims, particularly those victimized by their spouses, and no violation of due process has been shown.

Defendant next contends that he was denied his due process right to the disclosure of evidence by the trial court's exclusion of evidence concerning the victim's mental health records. In this regard, defendant argues that the victim waived any privilege as to her medical records because she never asserted the privilege in court, because she testified about her mental health and hospitalization in a prior legal proceeding, and because she had apparently released the records to the State's Attorney's office. Similarly, defendant maintains that he was entitled to the victim's mental health records to determine the basis for her diagnosis of a manic-depressive disorder and what effects her prescribed medication might have.

In *People v. Bean* (1990), 137 Ill. 2d 65, our supreme court held that a defendant was not denied his sixth amendment right of cross-

examination or his fourteenth amendment right to due process by the trial court's refusal to order disclosure of a witness' mental health records. The court approved the procedure whereby the trial court conducted an *in camera* inspection of the witness' mental health records to determine whether they contained relevant information which could be used to impeach the witness. (*Bean*, 137 Ill. 2d at 99-100.) While the records in *Bean* were privileged under the Mental Health and Developmental Disabilities Confidentiality Act (Act) (Ill. Rev. Stat. 1989, ch. 91½, par. 801 *et seq.*), as they were in this case, the court held that such privilege must give way to a defendant's sixth and fourteenth amendment rights but only to the extent that a trial court determines the privileged information to be relevant and impeaching. (*Bean*, 137 Ill. 2d at 100.) Just as a trial judge may limit cross-examination to prevent inquiries that are irrelevant, repetitive, or too time-consuming, that harass a witness, or that threaten to distract a jury from the actual issues by unduly emphasizing details of the witness' life, he may also limit a defendant's access to statutorily privileged information. (*Bean*, 137 Ill. 2d at 100-01.) When the patient or a therapist asserts the privilege, a trial judge may review *in camera* a witness' mental health records and disclose only those portions that are relevant when that relevance is not outweighed by other factors. *Bean*, 137 Ill. 2d at 101.

We consider *Bean* to control the resolution of this issue. Here, the defendant sought, in a motion for additional discovery, to examine the mental health records of the victim. Those records, which apparently had been reviewed by the State's Attorney's office, were then reviewed *in camera* by the trial court. Defendant's counsel agreed that the court should review the records *in camera* as to their admissibility and relevance. At the hearing following the trial court's *in camera* review, the court allowed defendant to review the victim's intake report to Central Du Page Hospital but refused defendant access to the remaining reports because it found the records to contain no statements of the victim relating to the incident in question. The court further found nothing in the reports relevant to the truth or veracity of the victim, relevant to her memory or perception, or of an impeaching nature. Based on the holding in *Bean*, the procedure followed in this case struck the proper balance between defendant's right to access information relevant to the credibility of a key witness and the need to maintain the confidentiality of the victim's mental health records.

Furthermore, we note that we have also reviewed the victim's mental health records submitted to the trial court. (See *Bean*, 137 Ill. 2d at 102.) We agree with the trial court that those records contained

no additional material relevant to the cross-examination or impeachment of the victim.

██ Defendant additionally argues, however, that the victim waived her privilege of confidentiality under the Act by not asserting her statutory privilege and by testifying concerning her mental health in a previous legal proceeding. Defendant also maintains that the fact of the State's possession of the requested records suggests waiver of the victim's privilege. The question of whether the victim failed to assert or, by her conduct, waived the statutory privilege is of no importance in this case as the trial court conducted an *in camera* review of the reports and rendered the ultimate determination as to the relevancy of the records. Once the court ruled the records to be irrelevant, there was no longer a need to assert the privilege inasmuch as the records would not be available for impeachment purposes. Thus, whether the victim did or did not assert or waive the statutory privilege in this case is inconsequential. Furthermore, we note that defendant acquiesced in the court's *in camera* review of the records. Defendant cannot now be heard to complain that such a procedure was improper when he agreed to the procedure in the trial court.

██ Finally, we turn to defendant's contention that he was denied his sixth amendment right to cross-examine the victim when the court granted the State's motion *in limine* prohibiting defendant from eliciting testimony of the victim's prior psychiatric hospitalizations and her prior diagnosis of a psychiatric disorder. A trial judge may limit cross-examination to prevent irrelevant inquiries or inquiries that threaten to distract the jury from the actual issues by unduly emphasizing details of a witness' life. (*Bean*, 137 Ill. 2d at 100-01.) The reception of evidence collateral to an issue in a case and intended to affect the credibility of a witness rests usually within the discretion of the trial court. (*People v. Renslow* (1981), 98 Ill. App. 3d 288, 293-94.) Absent an abuse of discretion in that regard, we will not disturb the trial court's ruling. (*Renslow*, 98 Ill. App. 3d at 294.) Relevant evidence is evidence that tends to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be absent the evidence. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487-88.) There is nothing about a witness' mental health generally that renders it relevant to the issue of a witness' credibility. A defendant must at the very least make some showing of how the witness' mental health bears on the question of credibility.

In this case, defendant failed to make any showing of how his proposed inquiry on cross-examination concerning the victim's hospitalization or diagnosis of a psychiatric disorder would be relevant to her

credibility at trial. There was nothing in the victim's mental health records, aside from the intake report, which was relevant to her impeachment. Absent any showing of relevancy by defendant, the trial court did not abuse its discretion in barring defendant from cross-examining the victim as to the hospitalization or diagnosis.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

McLAREN and UNVERZAGT, JJ., concur.