SECOND DIVISION

November 4, 2003

No. 1-02-0102

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the 

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )               

)

JUAN SANCHEZ, JR., ) Honorable

) Henry R. Simmons,

Defendant-Appellant. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court: 

The trial judge realized he had no choice: he had to sentence the defendant to life in prison.  The single question in this case is whether the mandatory natural life sentence violated provisions of the United States and Illinois constitutions.

Following a bench trial, defendant Juan Sanchez, Jr., was convicted of aggravated criminal sexual assault.  His mandatory natural life sentence was based on his prior conviction for criminal sexual assault.

On appeal, defendant contends: (1) his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11); (2) the sentence was imposed in violation of his constitutional rights pursuant to the rule announced in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and (3) his sentence violates his right to a trial by jury under the Illinois Constitution.  We affirm the defendant's conviction and sentence.

FACTS

 The indictment for aggravated criminal sexual assault charged that defendant: "committed an act of sexual penetration upon [Tess T.], to wit: contact between Juan Sanchez's penis and [Tess T.'s] vagina, by the use of force or threat of force and Juan Sanchez caused bodily harm to [Tess T.], to wit: bruising to [Tess T.'s] breast, in violation of Chapter 720 Act 5 Section 12-14(A)(2) of the Illinois Compiled Statutes 1992 as amended."  

At trial, Tess T. testified she was 13 years old at the time of the incident.  On January 4, 1999, she was with her father at his store in the mall.  Defendant, whom Tess knew as a friend of the family, came and asked her to go with him to drop something off.  She went with him, and, after a while, defendant parked the car.  He tried to kiss Tess twice, but she pushed him away and told him no.  The third time, he got on top of her and unfastened her pants and pulled down her pants and underwear.  He put his fingers in her vagina and lifted up her shirt and started sucking on her breast.  Defendant then put his penis in her vagina.  She tried to push him off but was not able to do so.   

 After defendant stopped, Tess put her clothes on and jumped in the back seat, and defendant drove away.  When she recognized where she was, Tess jumped out of the car and ran back to the mall.  She did not tell her father what happened because she was afraid of what he might do.  When they got home, Tess told her mother what happened and they went to the hospital and the police station. 

Cynthia T., Tess's mother, testified that Tess called her up to her bedroom immediately after arriving home.  Tess started crying and told Cynthia what happened.  Cynthia then called 9-11, and an ambulance came to take Tess to the hospital.

Dr. Mark Chionis testified that he examined Tess at Edwards Hospital in Naperville, Illinois.  She told him she was in an automobile and a person got on top of her, pulled down his pants and underwear and pulled down her underwear, and she felt pain in the vaginal area.  She also said the person "aggressively kissed her breasts and nipple area."  The physical examination revealed bruising around both nipple areas.  There was extensive redness and bruising of the perineal area surrounding the vagina.  The opening of the vagina was red and bruised.  

Dr. Chionis said the pelvic examination was very difficult because the patient was in severe pain.  He noticed a whitish discharge inside the vaginal vault and took a swab of her vaginal area.  Dr. Chionis said the kissing would have to be very aggressive to have caused the bruising on her breasts.  The bruises also could have been caused by being held down.  

Chicago Police Officer Ivira Torres testified she had a conversation with Tess, who told her she had been raped.  Tess's demeanor was shaken up and timid.  Officer Torres said she did not recall if Tess told her she jumped out of defendant's car.   The parties stipulated that vaginal swabs taken from Tess and a stain on her underwear tested positive for semen. Barbara Wilson, a DNA analyst, testified that a male DNA profile from the vaginal swabs and semen stain from the underwear matched the DNA profile of defendant.  

Defendant gave a statement at the police station to Assistant State's Attorney Luke Sheridan that was memorialized in a handwritten statement and read into the record.

In the statement, defendant said he had known Tess and her father for five years.  On January 4, 1999, he saw Tess at the mall and asked her to go "cruising" around.  She met him at the back of the mall, and they drove around for awhile.  Then defendant parked the car and began kissing Tess and "rubbing up" on her.  Tess was kissing him and rubbing his chest and stomach.  He lifted up her sweater and bra and started kissing and sucking her breasts.  Tess told him she was 13 years old and a virgin but did not tell him to stop.  Defendant had sex with Tess.  Defendant then drove Tess back to the mall.  At the end of the statement, defendant added that Tess wanted to continue the relationship.  

The defendant did not testify at trial.  The trial judge found defendant guilty of aggravated criminal sexual assault.  

At the sentencing hearing, defendant's father testified in mitigation.  Defendant's attorney argued that defendant had changed his life since he had been imprisoned, had gotten involved in a Christian deck of the jail, and wanted to help others.  Defendant had a troubled family life; his mother abused alcohol.  In aggravation, the State argued that defendant was found guilty in May 1996 of criminal sexual assault of a five-year-old child and placed on intensive probation for three years.  He had failed to complete the probation when he committed the present crime.  The State asked the judge to follow the statutory guidelines and sentence defendant to natural life.  

Defendant spoke in allocution.  He read a letter he wrote saying he was involved in the Cook County jail's Life Learning Program based on Christian living and had changed his life.  He was 23 years old, and he recognized he had made bad choices in his life.  He had a young son he wanted to raise.  He apologized to the victim and her family.  

       In sentencing defendant to natural life, the judge said:

"Well, I have listened to the facts, prior conviction, obviously.  And the presentence investigation.  And the law doesn't give me much choice in this matter which basically ties my hands.  So it makes my decision easy and it makes it difficult.  Although I believe you should receive a harsh penalty, clearly not convinced that life without parole is the penalty.  But be that as it may, the state legislature and the populace that elects the state legislature controls what the laws are in this state.  And I cannot sentence you to anything but life imprisonment in Illinois.  And the law mandates that I do that.  And that is the sentence that you are to receive."

DECISION

Defendant was convicted under the aggravated criminal sexual assault statute, which provides:

"(a) [t]he accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during *** the commission of the offense:

***

(2) the accused caused bodily harm *** to the victim."  720 ILCS 5/12-14(a)(2) (West 2000). 

Aggravated criminal sexual assault is a Class X felony, normally punishable by a term of 6 to 30 years.  720 ILCS 5/12-14(d)(1) (West 2000); 730 ILCS 5/5-8-1(a)(3) (West 2000).  However, where a person is convicted of the offense of aggravated criminal sexual assault after having been convicted of a separate criminal sexual assault, the person "shall be sentenced to a term of natural life imprisonment."  720 ILCS 5/12-14(d)(2) (West 2000); 730 ILCS 5/5-8-1(a)(2.5) (West 2000).     

I. Proportionate Penalties Clause

A statute is presumed constitutional.  The party challenging the statute bears the burden of demonstrating its invalidity.  
People v. Malchow
, 193 Ill. 2d 413, 418, 739 N.E.2d 433 (2000).  A court has a duty to construe a statute in a manner that upholds its constitutionality if it can reasonably be done, and any doubt must be resolved in favor of the statute's validity.  
Malchow
, 193 Ill. 2d at 418; 
People v. Morgan
, 203 Ill. 2d 470, 486, 786 N.E.2d 994 (2003).  The question of a statute's constitutionality is subject to 
de
 
novo
 review.  
People v. Carney
, 196 Ill. 2d 518, 526, 752 N.E.2d 1137 (2001).  

The proportionate penalties clause of the Illinois Constitution dictates that "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, §11.    

In 
People v. Lombardi
, 184 Ill. 2d 462, 474, 705 N.E.2d 91 (1998), the Illinois Supreme Court identified three analyses courts use to assess proportionality claims: (1) whether the penalty is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community (
People v. Bailey
, 167 Ill. 2d 210, 236, 657 N.E.2d 953 (1995); 
People v. Gonzalez
, 25 Ill. 2d 235, 240, 184 N.E.2d 833 (1962)); (2) whether the described offense, when compared to a similar offense, carries a more severe penalty although the proscribed conduct creates a less serious threat to the public health and safety (
People v. Moss
, 206 Ill. 2d 503, 795 N.E.2d 208 (2003); 
People v. Davis
, 177 Ill. 2d 495, 503, 687 N.E.2d 24 (1997)); or (3) whether the described offense, when compared to an offense having identical elements, carries a different sentence (
People v. Lewis
, 175 Ill. 2d 412, 417-18, 677 N.E.2d 830 (1996)).  
Morgan
, 203 Ill. 2d at 486-87.    

Defendant challenges his sentence under the first two proportionate penalties tests.  We first discuss whether the statute mandating life imprisonment for defendant carries a more severe penalty than that of a similar offense that creates a more serious threat to the public health and safety.  See 
Davis
, 177 Ill. 2d at 503.  Defendant compares the offense of aggravated criminal sexual assault with that of female genital mutilation and first degree murder. 

The cross-comparison analysis comparing two similar offenses involves a potential two-step inquiry, depending on the answer to the first question: (1) whether the offenses being compared share a common statutory purpose (
Lombardi
, 184 Ill. 2d at 476; 
Moss
, 206 Ill. 2d at 522); and (2) if the purposes are related, whether the less serious offense is punished more harshly than the more serious offense (
Lombardi
, 184 Ill. 2d at 475-76; 
Davis
, 177 Ill. 2d at 506).  

If the purposes of the two statutes are different, comparative proportionality review is inappropriate.  The inquiry ends.  
Moss
, 206 Ill. 2d at 523.  Where statutes are enacted for different purposes, we presume that the legislature considered different factors in determining the appropriate penalties for the offenses, and we defer to the legislature's judgment.  
Lombardi
, 184 Ill. 2d at 476.  

If the purposes of the two statutes are related, we must then determine whether the offense with the harsher penalty is more or less serious than the offense with the lesser penalty.  
Lombardi
, 184 Ill. 2d at 475-76, citing 
Davis
, 177 Ill. 2d at 506.  Factors to be considered in determining the seriousness of an offense are the degree of harm, the frequency of the crime, and the high risk of bodily harm associated with it.  
Moss
, 206 Ill. 2d at 529, citing 
People v. Lee
, 167 Ill. 2d 140, 146, 656 N.E.2d 1065 (1995); 
People v. Hill
, 199 Ill. 2d 440, 454, 771 N.E.2d 374 (2002).   

Defendant contends the legislative purpose of the female genital mutilation statute is related to that of aggravated criminal sexual assault.  We do not agree.  

A person commits the offense of female genital mutilation when he or she "knowingly circumcises, excises, or infibulates, in whole or in part, the labia majora, labia minora, or clitoris of another."  720 ILCS 5/12-34(a) (West 2000).  Female genital mutilation is a Class X felony, punishable by 6 to 30 years in prison.  720 ILCS 5/12-34(c) (West 2000); 730 ILCS 5/5-8-1(a)(3) (West 2000).  

Defendant contends female genital mutilation and aggravated criminal sexual assault are similar offenses because both involve an act of sexual penetration as a necessary element of the offense.  Circumcision, excision, and infibulation involve contact with and/or the intrusion of an object into a female's sex organs and are therefore acts of sexual penetration.  Female genital mutilation involves cutting ("circumcision"), removing the genitals ("excision"), or sewing the vagina almost completely closed after the genitals are removed ("infibulation").  See 
Nwaokolo v. Immigration & Naturalization Service
, 314 F.3d 303, 308-309 (7th Cir. 2002) (granting a stay of removal for mother where daughter would suffer irreparable injury if made to accompany mother to Nigeria and undergo female genital mutilation).  Defendant contends both offenses also involve some bodily harm.     

We agree with the State's contention that the goal of the female genital mutilation statute is to prohibit female ritual circumcision, an ancient cultural or social custom with no medical value which has health risks to a female child.  Use of force is not a statutory element of the offense.  Conversely, the goal of the aggravated criminal sexual assault statute is to protect victims from, and punish perpetrators for, sexually harmful and offensive conduct.  See 
People v. Printy
, 232 Ill. App. 3d 735, 742, 598 N.E.2d 346 (1992).  Moreover, at issue here is a recidivist sentencing provision, which has the purpose of deterring repeat offenders and "imposing harsher sentences on offenders whose repeated convictions have shown their resistance to correction."  
People v. Robinson
, 89 Ill. 2d 469, 476, 433 N.E.2d 674 (1982).    

Defendant's analysis comparing the elements of the statutes is incorrect.  The proper analysis focuses on the legislative purposes of the statutes.  We find aggravated criminal sexual assault and female genital mutilation do not share similar purposes.  

The language of a statute is the best indication of the legislature's intent.  
Lombardi
, 184 Ill. 2d at 477.  The purpose of the female genital mutilation statute is not clear from the language itself.  Where a statute is ambiguous, we may turn to the legislative history as an aid in interpreting the provision.  
People v. Donoho
, 204 Ill. 2d 159, 173, 788 N.E.2d 707 (2003).  

The transcripts of the legislative debates reveal the purpose of the female genital mutilation statute is as the State contends.  The goal was to prevent "female circumcision," or the "medically unnecessary modification of the female genitalia" which is practiced in other parts of the world for religious, superstitious, and traditional reasons.  90th Ill. Gen Assem., House Proceedings, February 19, 1997, at 120-21 (statements of Representatives Mulligan and Schakowsky).  According to the House sponsor of the bill, the reason for the law was the large immigrant population coming to the United States from countries that followed the practice and patients requesting doctors to perform the procedure.  90th Ill. Gen Assem., House Proceedings, February 19, 1997, at 121-22 (statements of Representative Mulligan).

By its language, the clear purpose of the aggravated criminal sexual assault statute is to punish and deter violent sexual offenders. This court has held the purpose of the aggravated criminal sexual assault statute is to protect victims of forcible sexual penetration where such conduct is accompanied by certain aggravating circumstances.  
Printy
, 232 Ill. App. 3d at 742.  The underlying purpose served by the law is to protect victims and punish perpetrators by curtailing sexually harmful and offensive conduct.  
Printy
, 232 Ill. App. 3d at 742.  That is far different than the purpose behind the prohibition of female genital mutilation.    

Since we have determined the statutes have distinct legislative purposes, there is no need to engage in a further cross-comparison of whether the statute that provides for a harsher penalty is less serious than the statute with the lesser penalty.  
Lombardi
, 184 Ill. 2d at 476.  However, for the sake of completeness, we will consider the second step in the analysis. We find female genital mutilation is not a more serious offense than aggravated criminal sexual assault where the offender has a prior conviction for criminal sexual assault.  

Factors to be considered in determining the seriousness of an offense are the degree of harm, the frequency of the crime, and the high risk of bodily harm associated with it.  
People v. Hill
, 199 Ill. 2d 440, 454, 771 N.E.2d 374 (2002), citing 
People v. Lee
, 167 Ill. 2d 140, 146, 656 N.E.2d 1065 (1995).  Also, the legislature may perceive a need to enact a more stringent penalty provision in order to halt an increase in the commission of a particular crime.  
Hill
, 199 Ill. 2d at 454.  Because the legislature is better able than the judiciary to identify the evils confronting society and gauge the seriousness of an offense, courts will generally defer to the legislature's judgment that a particular offense is more serious than another.  
Hill
, 199 Ill. 2d at 454, citing 
People v. Steppan
, 105 Ill. 2d 310, 319, 473 N.E.2d 1300 (1985); 
Davis
, 177 Ill. 2d at 502-03.  

Defendant contends female genital mutilation is a more serious offense because, unlike aggravated criminal sexual assault, it involves the knowing infliction of severe bodily injury, yet it receives a lesser penalty.  It isn't.  Both are Class X felonies, carrying sentences of 6-30 years.  Aggravated criminal sexual assault becomes more serious when the offender previously was convicted of criminal sexual assault.  The penalty, while harsh, is triggered by recidivism.  

The State contends, and we agree, the degree of harm resulting from an offense is only one factor to be considered in determining the seriousness of an offense.  The State cites other factors such as the pervasive nature of aggravated criminal sexual assault and the harm caused by a recidivist sex offender compared with the rarity of occurrences of female genital mutilation.  The legislature could legitimately determine the danger posed by a repeat sex offender is more serious than an isolated incident involving a crude and painful procedure.  We are not willing to second-guess that legislative judgment.      

Defendant also compares aggravated criminal sexual assault with first degree murder.  He contends the punishment of mandatory life imprisonment imposed on a person convicted of aggravated criminal sexual assault after previously being convicted of criminal sexual assault is disproportionate to the penalty range of 20 to 60 years imposed on a person who commits first degree murder after previously being convicted of criminal sexual assault.  720 ILCS 5/5-8-1(a)(1) (West 2000).  He cites the United States Supreme Court's decision in 
Coker v. Georgia
, 433 U.S. 584, 600, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977), where the court held a death sentence for the crime of rape was cruel and unusual punishment in violation of the Eighth Amendment.  This case is not applicable here, as defendant makes no Eighth Amendment claim.   

Defendant does not attempt to argue the legislative purpose of murder is similar to that of aggravated criminal sexual assault.  The two are not comparable, and it is unnecessary to engage in a cross-comparison analysis of which offense is more serious, and which receives a greater penalty.  See 
Davis
, 177 Ill. 2d at 506.  We would point out some first degree murders carry a sentence of more than 20-60 years.  See 730 ILCS 5/5-8-1(a)(1)(c) (West 2000).   

Defendant next contends his mandatory life sentence violates the proportionate penalties clause because it is so disproportionate to the offense as to shock the moral sense of the community.  
Lombardi
, 184 Ill. 2d at 474.  He contends he was convicted based on slight and temporary bodily harm that amounted to simple battery--bruises to the victim's breast.  Had he not bruised her breast, he says, he would have been convicted of criminal sexual assault, and the court could have imposed at most a term of 30 to 60 years' imprisonment.  720 ILCS 5/12-13(b)(2) (West 2000).  

Defendant compares this case to 
People v. Miller
, 202 Ill. 2d 328, 781 N.E.2d 300 (2002), where the Illinois Supreme Court held a sentence of natural life imprisonment for a 15-year-old defendant violated the proportionate penalties clause.  In 
Miller
, the defendant was charged with two counts of first degree murder based on accountability.  The defendant was asked to be a lookout, while two other individuals shot and killed the two victims.  

The defendant's conviction was "the result of three converging statutes."  
Miller
, 202 Ill. 2d at 340.  Under the automatic transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-4(6)(a) (West 1996)), the defendant was tried as an adult in criminal court.  Under the accountability statute (720 ILCS 5/5-2(c) (West 1996)), the court was barred from considering the defendant's degree of participation in the crime.  Finally, the multiple-murder sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)) did not allow the court to consider the age of the offender or his participation in the crime at the time of sentencing.  
Miller
, 202 Ill. 2d at 340.  

The 
court held a mandatory life sentence with no possibility of parole grossly distorted the facts of the case and did not accurately represent the defendant's personal culpability in a way that shocked the moral sense of the community.  
Miller
, 202 Ill. 2d at 341.  "This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole--the same sentence applicable to the actual shooter."  
Miller
, 202 Ill. 2d at 341.  

This case is wholly distinguishable from 
Miller
.  Defendant was not a juvenile offender at the time of the offense.  This defendant, unlike the defendant in 
Miller
, was a repeat offender.  Defendant's personal culpability was not "grossly distorted" by the statute.  Rather, defendant's actions fit squarely within the conduct proscribed by the aggravated criminal sexual assault statute.  Defendant was not convicted on a theory of accountability, but was the principal offender in the crime.  We find the defendant's sentence is not disproportionate to the crime in a way that shocks the moral sense of the community.  

In addition, as the State points out, the harm in this case is not limited to bruising of the victim's breast.  The evidence at trial showed the victim was in "severe pain" during the hospital exam and sustained bruises to her vaginal area as well as her breasts, which could have been caused from being held down.  We need not speculate about the psychological harm done to victims of forcible sexual assaults.  The mandatory life sentence provision reflects the legislature's decision to treat severely those who engage in repetitive conduct of sexual assault because it recognizes the harm caused to victims.   

II. 
Apprendi
  
 

Defendant next contends his natural life sentence was based on an unconstitutional statute pursuant to 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).  In 
Apprendi
, the court held, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490.  

Defendant was convicted of aggravated criminal sexual assault, and, because of his prior conviction for criminal sexual assault, was subject to a mandatory sentence of natural life imprisonment under section 12-14(d)(2).  720 ILCS 5/12-14(d)(2) (West 2000).  Defendant contends this recidivist provision is unconstitutional because he was entitled to a trial by jury to prove the fact of his previous conviction beyond a reasonable doubt.  

This issue has been decided by this court in 
People v. Ware
, 323 Ill. App. 3d 47, 57, 751 N.E.2d 81 (2001), where we rejected the defendant's contention that section 12-14(d)(2) was unconstitutional under 
Apprendi
.  In 
Ware
, the court held prior convictions are considered an exception to the general rule that facts which increase a penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  
Ware
, 323 Ill. App. 3d at 57, citing 
Apprendi
, 530 U.S. at 490.  See also 
People v. Lathon
, 317 Ill. App. 3d 573, 587, 740 N.E.2d 377 (2000) (general rule requiring a jury determination of fact issues for sentencing did not apply to recidivist provision under 
Apprendi
); 
People v. Roberts
, 318 Ill. App. 3d 719, 729, 743 N.E.2d 1025 (2000) (defendant's sentencing as a recidivist offender was not subject to 
Apprendi
 rule); 
People v. Ramos
, 318 Ill. App. 3d 181, 193, 742 N.E.2d 763 (2000) ("
Apprendi
 clearly exempts recidivist statutes").  

We agree with 
Ware
 that the holding in 
Apprendi
 does not apply to section 12-14(d)(2), a recidivist provision, and does not render defendant's sentence unconstitutional.     

III. Right to trial by jury

Defendant's final contention is that section 12-14(d)(2) violates the right to trial by jury guaranteed by the Illinois Constitution.  Article I, section 13 of the Illinois Constitution provides that "the right of trial by jury as heretofore enjoyed shall remain inviolate."  Ill. Const. 1970, art. I, § 13.  Defendant contends the existence of a prior conviction, when used to enhance a sentence, is a fact in controversy which must be decided by a jury.  This court has addressed a related issue with respect to extended-term sentences in 
People v. Pittman
, 326 Ill. App. 3d 297, 761 N.E.2d 171 (2001) (finding extended-term sentence under section 5-5-3.2(b)(1) and 5-8-2 did not violate defendant's right to jury trial under the Illinois Constitution); and 
People v. Smith
, 338 Ill. App. 3d 555, 788 N.E.2d 1204 (2003) (finding section 5-5-3(c)(8) did not violate right to jury trial under Illinois Constitution).  

Despite the substantive differences between the Federal and Illinois constitutional provisions providing the right to a jury trial, the 
Pittman
 court held the safeguards discussed in 
Apprendi
 applied to mitigate the constitutional concerns raised by defendant.  In 
Apprendi
, the Supreme Court noted that "a defendant's prior conviction does not relate to the commission of the offense with which he stands charged and that the prior conviction is the result of proceedings in which the defendant had the right to a trial by jury and the State was required to establish his guilt beyond a reasonable doubt."  
Pittman
, 326 Ill. App. 3d at 301, citing 
Apprendi
, 530 U.S. at 496.          

We find the reasoning in 
Pittman
 and 
Smith
 is sound and apply it to this case.  We hold section 12-14(d)(2) does not violate the defendant's right to a jury trial pursuant to the Illinois Constitution.     

CONCLUSION 

We affirm defendant's conviction and his natural life sentence. 

Affirmed.

CAHILL, and GARCIA, JJ., concur.