THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL A. WALLS, Defendant-Appellant.

Fifth District No. 5—01—0771

Opinion filed March 19, 2004.

KUEHN, J., specially concurring.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Gary Duncan, State's Attorney, of Mt. Vernon (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DONOVAN delivered the opinion of the court:

Defendant, Michael A. Walls, appeals his conviction of aggravated criminal sexual assault. Defendant raises the following three contentions on appeal to this court: (1) he was denied a fair trial when the court prevented him from presenting evidence attacking the complaining witness's credibility with a prior false accusation of a crime, (2) the trial was a nullity based on the use of a special assistant State's Attorney, and (3) section 12—14(d)(2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12—14(d)(2) (West 2000)), which mandates a term of natural-life imprisonment for a second conviction of aggravated criminal sexual assault, is unconstitutional under section 11 of article 1 of the Illinois Constitution because it creates a disproportionate penalty when compared to other more serious crimes. For the following reasons, we affirm.

## BACKGROUND

On November 25, 2000, Kathy, her cousin Jackie, and defendant met at the Corner Tavern in Mt. Vernon, Illinois. Defendant and Kathy had met on an Internet chat room about six months before the incident involved in this case. Later that evening, the threesome left the Corner Tavern in defendant's van and, in search of money, visited the homes of several friends. When they failed to secure any cash, the trio went to Club 57. They left Club 57, and defendant and Kathy dropped Jackie off at the Corner Tavern and proceeded to defendant's trailer to search for money.

### Kathy's Testimony and Corroborative Evidence

After entering the trailer, Kathy looked through a jar for money.

Defendant gave her a beer. Kathy dropped her cigarettes, and when she bent over to pick them up, defendant hit her in the head with a hammer. Defendant then told Kathy to stay down or he would hurt her again. Defendant picked Kathy up and took her into the back bedroom and placed her on the bed. Defendant forced her to get on her hands and knees, tied her hands and feet, tied her to the bed, and put a cloth around her mouth.

Defendant left the bedroom to go to the bathroom. When he returned, he pulled Kathy's pants and underwear down to her knees and placed his penis in her vagina. After he finished, defendant sat on the bed, untied Kathy, and told her that he was sorry. Defendant also told her that he would not blame her if she went to the police. Defendant then drove Kathy home and again told her he was sorry.

Once inside her home, Kathy woke up her mother and told her that she had been raped. Her mother drove her to Good Samaritan Hospital in Mt. Vernon shortly after 1 a.m. At the hospital, Kathy spoke to several medical staff members and police officers about the incident. Kathy had a large knot on her head, described by hospital staff members as a hematoma. Dr. Richard Garretson, the emergency room physician at Good Samaritan Hospital, testified that the hematoma came from a blow to the head that had been very recent and that he believed that the hematoma was "consistent with the blow from the hammer." Kathy developed bruises on her ankles from being tied up. Medical personnel and police officers described the bruises as ligature marks.

## Defendant's Testimony

When defendant and Kathy entered defendant's trailer, Kathy sat on the couch and asked defendant for a cigarette. Defendant gave Kathy his last beer. Defendant testified that Kathy seemed frustrated and angry because they could not come up with any money. Defendant stated that he then asked, "What would you say if I just up and just kissed you right here?" Kathy replied, "I got no problem with that." They then started kissing and things got "heated." Defendant and Kathy then stretched out on the couch. Kathy accidentally "bumped her head" on the edge of the couch, and she immediately grabbed her head and claimed she was in pain. Kathy was irritated but finally calmed down. Defendant then suggested they go to the bedroom.

In the bedroom, they removed their clothes and defendant put on a condom before engaging in sexual intercourse. After a few minutes, defendant discovered that the condom had broken. He sat on the bed with his head in his hands. Defendant testified, "[Kathy] commenced to getting in my stuff, getting argumentative with me, [and] telling me

not only was I broke but I was sexually unsatisfied and apparently didn't know what I was doing, if I was having sex and have [*sic*] a condom broke on me." Defendant admitted that he had ejaculated, that he put the condom in the toilet, and that they both got dressed.

Kathy walked out of the trailer door first and got into the van. Defendant then drove Kathy home. After defendant stopped at her residence, Kathy asked for one more cigarette. Defendant testified that he could tell that Kathy was angry when she walked to her home. Defendant waited until Kathy was inside her home and then drove to Kimmie's Bar.

Defendant had one beer at Kimmie's Bar. He tried to start his van to drive home, but it would not start. It took defendant about 15 to 20 minutes to walk home. Defendant went to sleep and awoke the next morning to a knock on the door by the police. Defendant was frightened by the nature of the complaint alleging that he had raped Kathy and by the demeanor of the police. Defendant denied that any sex act had occurred. Defendant basically denied everything because of the way he was approached by the police. He was under the assumption that the police would probably get more rude if he admitted that he had sex with Kathy.

### Detective Mark Junkins' Testimony

Detective Mark Junkins went to defendant's trailer to investigate Kathy's complaint. Defendant told Detective Junkins that he had been with Kathy at the Corner Tavern the previous evening. They had traveled around and looked for some money to go to Club 57. After dropping Kathy's cousin off at the Corner Tavern, defendant and Kathy went to his trailer to look for money. Defendant gave Kathy a beer, and after not finding any money, he drove her home. Defendant denied that he had sexual intercourse with Kathy, denied that she had been on his bed, and denied knowledge of how the condom wrapper the police found came to be in the toilet in his trailer.

### Stipulations

Defendant and the State stipulated that the evidence collected at Good Samaritan Hospital was examined at the forensic laboratory. Defendant's semen was found on the rectal swab taken from the underwear worn by Kathy that night.

### Jury Verdict and Sentence

The jury found defendant guilty of unlawful restraint and three counts of aggravated criminal sexual assault. At the sentencing hearing on September 24, 2001, the trial court vacated defendant's conviction for unlawful restraint, finding that the offense of unlawful

restraint is an inherent factor in the charge of aggravated criminal sexual assault. The court sentenced defendant to natural-life imprisonment on one count of aggravated criminal sexual assault. The court denied defendant's motion to declare section 12—14(d)(2) of the Criminal Code (720 ILCS 5/12—14(d)(2) (West 2000)) unconstitutional and impose a term of imprisonment less than natural-life imprisonment, finding that natural-life imprisonment was mandatory pursuant to the statute, based on defendant's previous conviction in 1985 of aggravated criminal sexual assault.

## ANALYSIS

### Evidence Attacking Kathy's Credibility

■ Defendant's first issue on appeal is whether he was denied a fair trial because the court prevented him from presenting evidence attacking Kathy's credibility with a prior false accusation of an offense. Before the trial, the State filed a motion *in limine* to prevent the defense from introducing testimony that Kathy had made a prior criminal complaint of domestic battery against her husband, Tony, and that at some time later she filed a document with her husband's attorney recanting her original statement to the police. In granting the State's motion, the circuit court reasoned as follows:

"Whether [the victim] lied or not about a totally unrelated matter is collateral to this case and would be collateral impeachment, and the case law in the Fifth District is very clear[:] the fact that on a former occasion that she may have lied about a totally unrelated matter is not permissible. Motion is granted."

Although it is permissible to show that a witness in a criminal case has a bad reputation for truth and veracity, it is not permissible to impugn a witness's credibility by establishing that on a former specific occasion, the witness lied about a totally unrelated matter. See *People v. West*, 158 Ill. 2d 155, 162, 632 N.E.2d 1004, 1007 (1994) (rejecting the argument that specific acts of untruthfulness may be used to impeach in cases involving children who are too young to have developed a reputation as an exception to the rule that only reputation evidence may be used for impeachment); *People v. McGee*, 286 Ill. App. 3d 786, 796, 676 N.E.2d 1341, 1348 (1997) ("specific instances of untruthfulness are not admissible to attack a witness's believability").

Defendant argues that the case of *People v. Nicholl*, 210 Ill. App. 3d 1001, 569 N.E.2d 604 (1991), is on point. In *Nicholl*, the defendant argued that the court erred in not allowing evidence that a minor victim's subsequent complaint of abuse against the defendant had been determined to be unfounded by the Department of Children and Family Services. Upon review, the court concluded that the trial court

should have allowed this evidence. *Nicholl* is easily distinguished from the case at bar. In *Nicholl*, the evidence sought to be admitted related to the same victim and the same defendant. In the case at bar, the evidence sought to be admitted relates to the same victim but involved someone other than defendant. We fail to see how a false complaint made by Kathy against her husband about a domestic battery, an entirely different charge than the rape in this case, can be considered materially relevant to the issue of whether Kathy lied when she told the police that she had been sexually assaulted by a man who was not her husband. Such collateral information is not admissible.

Even if this testimony had been allowed, we believe that the jury still would have returned a guilty verdict based on the evidence in this case. This is not a case where the evidence was closely balanced. Rather, there was sufficient evidence to establish that defendant committed these crimes, based on the testimony of Kathy, medical personnel, and officers. Therefore, we find that the trial court did not err by granting the motion *in limine* to exclude the testimony related to Kathy's former complaint against her husband.

### Use of State's Attorneys Appellate Prosecutor

Defendant's next argument is that the trial was a nullity because the attorney for the Office of the State's Attorneys Appellate Prosecutor who appeared in this case did not have the statutory authority to assist in the prosecution of this aggravated-criminal-sexual-assault charge.

Before the trial, this case had been handled exclusively by Jefferson County assistant State's Attorney Nicole Villani. On the day of the trial, David Rands, a prosecutor from the Office of the State's Attorneys Appellate Prosecutor (SAAP), appeared with Ms. Villani and entered his appearance, whereupon he subscribed an oath before the circuit court as "[s]pecial [a]ssistant State's Attorney." Defense counsel objected to Mr. Rands' assistance, stating, "I would object to his assistance at this time due to the fact that the State's Attorney's budget is and with—in addition to its extra resources available, it creates an unfair advantage to the State to have such assistance." Defendant failed to object to Rands' participation on the basis that he did not have the statutory authorization to participate in the prosecution of this case. The circuit court overruled the objection, and defendant did not contend in his motion for a new trial that Rands' participation was unauthorized.

Defendant relies on this court's decision in *People v. Ward*, 326 Ill. App. 3d 897, 762 N.E.2d 685 (2002). In *Ward*, this court held that the assistance of a SAAP attorney in a drug prosecution rendered that prosecution void, in that the special attorney was not authorized by

statute to assist in the prosecution and, further, that the court record was devoid of an order appointing the attorney as a special assistant State's Attorney.

Several months later, our court distinguished *People v. Ward* in *People v. Woodall*, 333 Ill. App. 3d 1146, 777 N.E.2d 1014 (2002). In *Woodall*, the court found that while the SAAP attorneys were court-appointed "special assistant State's Attorneys," the act of appointment was of no legal consequence because the SAAP attorneys lacked statutory authority to prosecute the matter, based on the language of the SAAP's enabling statute. However, the court in *Woodall* later noted that the defense team in the case had not complained about the use of the SAAP, and the court found that the wrongful participation of a SAAP attorney did not render the prosecution void, because the circuit court had subject matter jurisdiction over the prosecution as a result of the charges validly initiated by the State's Attorney and because personal jurisdiction had been acquired when the defendant appeared and joined the issues with a plea. The court in *Woodall* distinguished *Ward*, stating:

> "*Ward* should not be read as the source of a novel jurisdictional rule that would void all convictions procured by licensed attorneys who, for whatever reason, mistakenly believe that they are authorized to act on the State's behalf and who are permitted to do so by those being prosecuted. Any defect in an attorney's appointment process or in his or her authority to represent the State's interests on a given matter is not fatal to the circuit court's power to render a judgment. The right to be prosecuted by someone with proper prosecutorial authority is a personal privilege that may be waived if not timely asserted in the circuit court." *Woodall*, 333 Ill. App. 3d at 1159, 777 N.E.2d at 1024-25.

We believe that *Woodall* controls this case in that it holds that even if an appointment is defective, the defective appointment of special assistant prosecutors does not nullify a judgment of conviction. Additionally, we note that as in *Woodall*, the only objection defendant had to Rands' participation was that Rands' participation gave the State an unfair advantage in terms of the number of prosecutors and financial resources available to the State. Thus, unlike the defendant in *Ward*, who complained that the SAAP did not have authority pursuant to the statute, defendant in this case only objected for financial reasons and only now objects to the use of the SAAP for statutory reasons. Therefore, we find that defendant has forfeited this issue.

## Proportionate Penalties

Finally, defendant argues that section 12—14(d)(2) of the Criminal Code (720 ILCS 5/12—14(d)(2) (West 2000)) is unconstitutional pursu-

ant to section 11 of article I of the Illinois Constitution because it creates a disproportionate penalty. Specifically, defendant argues that section 12—14(d)(2), which mandates a term of natural-life imprisonment for a second conviction of aggravated criminal sexual assault while the more serious conduct of committing two first-degree murders is the same mandatory term of natural-life imprisonment (730 ILCS 5/5—8—1(a)(1)(c)(i) (West 2000)), is unconstitutional pursuant to section 11 of article I of the Illinois Constitution because it creates a disproportionate penalty.

■ The Illinois Constitution mandates the following: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We note that a proportionate-penalties challenge is limited in that the legislature has the inherent authority to set the nature and extent of the criminal penalties, and the court may not interfere with such legislation unless the challenged penalty is clearly in excess of the very broad and general constitutional limitations available. *People ex rel. Carey v. Bentivenga*, 83 Ill. 2d 537, 542, 416 N.E.2d 259, 262 (1981). The decisions of the legislature are entitled to a presumption of constitutionality. *Bentivenga*, 83 Ill. 2d at 542, 416 N.E.2d at 262.

In *People v. Lombardi*, 184 Ill. 2d 462, 705 N.E.2d 91 (1998), the Illinois Supreme Court noted three separate analyses used to identify a proportionate-penalties clause violation: (1) a penalty violates the proportionate-penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed that it shocks the moral sense of the community, (2) a penalty is invalid under the proportionate-penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely ("the cross-comparison analysis"), and (3) there is a violation of the proportionate-penalties clause when identical offenses are given different sentences. *Lombardi*, 184 Ill. 2d at 474, 705 N.E.2d at 98.

■ In the case at bar, defendant was found guilty of the Class X felony of aggravated criminal sexual assault, which is defined as follows:

"(a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during *** the commission of the offense:

(1) the accused displayed, threatened to use, or used a dangerous weapon, other than a firearm, or any object fashioned or utilized in such a manner as to lead the victim under the

circumstances reasonably to believe it to be a dangerous weapon[.]" 720 ILCS 5/12—14(a)(1) (West 2000).

■ Previous to this case, in 1985, defendant had been convicted of aggravated criminal sexual assault after he sexually assaulted a 14-year-old girl while threatening her with a knife. Based on these convictions, defendant was sentenced to the mandatory term of natural-life imprisonment pursuant to section 12—14(d)(2) of the Criminal Code. Section 12—14(d)(2) provides that a person who is convicted of a second or subsequent offense of aggravated criminal sexual assault "shall be sentenced to a term of natural[-]life imprisonment." 720 ILCS 5/12—14(d)(2) (West 2000). See also *People ex rel. Devine v. Macellaio*, 199 Ill. 2d 221, 766 N.E.2d 1082 (2002) (the trial judge was required to sentence the defendant to natural-life imprisonment for a second aggravated-criminal-sexual-assault conviction).

Defendant argues that a sentence of natural-life imprisonment cannot "fit neatly" into any of the three analyses because natural-life imprisonment is different from a sentence for a term of years: "[N]atural[-]life imprisonment rejects the goal of rehabilitation and denies the person sentenced any hope for eventual release, while there is hope and prospect for eventual release from a term of imprisonment for a set number of years." Defendant further argues, "Mandatory natural[-]life imprisonment for two convictions of *any* offense less serious than murder must be found to violate the proportionate[-]penalties clause." (Emphasis added.) We first note that we decline the invitation to go outside the three analyses set forth in *Lombardi* as requested by defendant. The Illinois Supreme Court continues to use the well-established tests announced in *Lombardi*. See *People v. Graves*, 207 Ill. 2d 478, 800 N.E.2d 790 (2003); *People v. Moss*, 206 Ill. 2d 503, 795 N.E.2d 208 (2003); *People v. Hill*, 199 Ill. 2d 440, 452, 771 N.E.2d 374, 381 (2002). Additionally, defendant himself is attempting to compare two statutes, thus instituting the second test. Thus, we adhere to the three analyses established in *Lombardi*.

Subsequent to this case being briefed and argued, the issue of whether a mandatory natural-life sentence for aggravated criminal sexual assault violated the proportionate-penalties clause of the Illinois State Constitution was decided in *People v. Sanchez*, 344 Ill. App. 3d 74, 800 N.E.2d 455 (2003). In *Sanchez*, the defendant was convicted of aggravated criminal sexual assault for the rape of a 13-year-old girl. Previous to the rape, the defendant had been found guilty of the criminal sexual assault of a five-year-old child and placed on intensive probation for three years. The defendant had not completed the probation when he committed the rape of the 13-year-old girl. Based on section 12—14(d)(2) of the Criminal Code (720 ILCS

5/12—14(d)(2) (West 2000)) and section 5—8—1(a)(2.5) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(2.5) (West 2000)), the trial judge sentenced the defendant to natural-life imprisonment.

In *Sanchez*, the defendant first attempted to compare the statutes defining female genital mutilation (720 ILCS 5/12—34(a) (West 2000)) and aggravated criminal sexual assault (720 ILCS 5/12—14(a)(2) (West 2000)) in order to fall within the *Lombardi* cross-comparison analysis for similar offenses. Under the cross-comparison test, the court must determine (1) whether statutes defining the offenses being compared share a common statutory purpose, and then, (2) if the purposes are related, whether the less serious offense is punished more harshly than the more serious offense. In *Sanchez*, the court determined that the legislative purpose of the female-genital-mutilation statute is not related to the purpose of the aggravated-criminal-sexual-assault statute. The purpose of the aggravated-criminal-sexual-assault statute is to punish and deter violent sexual offenders. See *People v. Printy*, 232 Ill. App. 3d 735, 598 N.E.2d 346 (1992) (the purpose of the aggravated-criminal-sexual-assault statute is to protect victims of forcible sexual penetration where such conduct is accompanied by certain aggravating factors, and the purpose served by the law is to protect victims and punish perpetrators by curtailing sexually harmful and offensive conduct). That is not the purpose behind the female-genital-mutilation statute. Based on this finding, the court did not need to engage in a further comparison of whether the offense with the harsher penalty is less serious than the offense with the lesser penalty. For the sake of completeness, the *Sanchez* court did go on to find that female genital mutilation is not more serious than aggravated criminal sexual assault where the offender has a previous conviction for criminal sexual assault.

The court next addressed the defendant's argument, similar to defendant's contention in the case at bar, that a natural-life sentence imposed on a person convicted of aggravated criminal sexual assault after having been previously convicted of criminal sexual assault is disproportionate to the penalty range of 20 to 60 years' imprisonment imposed on a person who commits first-degree murder after having been previously convicted of criminal sexual assault. The *Sanchez* court found that the purpose of the murder statute and the purpose of the aggravated-criminal-sexual-assault statute are not comparable, and thus, the court found it unnecessary to engage in a cross-comparison analysis of which offense is more serious and which receives a greater penalty. Finally, the court determined that, according to the *Lombardi* analysis, the defendant's sentence was not disproportionate to the crime in a way that shocked the conscience or the moral sense of the community.

■ We adopt the reasoning of the appellate court in the First District in the *Sanchez* opinion. We defer to the judgment of the legislature and believe that it considered the seriousness of aggravated criminal sexual assault and the rehabilitative potential of the offenders. None of the tests established by *Lombardi* compel us to find that the penalty is disproportionate. We will not employ a cross-comparison analysis, because the purposes behind the statutes are not similar. Similarly, we do not find that the natural-life sentence shocks our conscience or the moral sense of the community. In this case, defendant hit the victim in the back of the head with a hammer, bound her ankles and hands, gagged her mouth, and then raped her. Previous to this case, defendant was convicted of an aggravated criminal sexual assault. Sentencing defendant to natural life after he has been convicted of two aggravated criminal sexual assaults seems reasonably designed to protect the public. As stated by the *Sanchez* court: "We need not speculate about the psychological harm done to victims of forcible sexual assaults. The mandatory life sentence provision reflects the legislature's decision to treat severely those who engage in repetitive conduct of sexual assault because it recognizes the harm caused to victims." *Sanchez*, 344 Ill. App. 3d at 85, 800 N.E.2d at 465. Therefore, based on the facts presented, we find that defendant has been unable to show that there is a violation of the proportionate-penalties clause.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Jefferson County is affirmed.

Affirmed.

CHAPMAN, P.J., concurs.

JUSTICE KUEHN, specially concurring:

I concur with the majority opinion. However, I believe the trial judge's refusal to allow impeachment with a former false accusation to law enforcement authorities was harmless error.

The majority does not see how a prior false complaint of domestic battery against the accuser's husband is relevant to whether she is making false accusations of rape against the defendant. It seems to me highly relevant for an accused to be able to show that his accuser is capable of initiating criminal charges, bringing to bear the power of the State through law enforcement and judicial institutions, against an innocent person by the leveling of a false accusation. The defendant was trying to show something far more troubling to an accuser's cred-

ibility than a mere showing that she had lied about something on a former occasion. He wanted to prove that she had invoked the power of the State and procured criminal charges with falsehoods in the past. Such a desire does not appear to be all that collateral to what is at issue when she is the sole accuser and witness against an accused in a criminal case.

I agree with my colleagues that the use of this evidence to impeach would not have changed the outcome, given the physical corroboration of the accusation, the defendant's vacillating explanations to authorities, and the defendant's implausible testimony. Therefore, I specially concur.